HAWAIIAN TRUST COMPANY, LIMITED, EXECUTOR OF THE WILL OF WILLIAM WOON, DECEASED, *v.* E. S. SMITH, TREASURER OF THE TERRITORY OF HAWAII.

No. 1872.

ARGUED NOVEMBER 19, 1929.　　　DECIDED DECEMBER 18, 1929.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PERRY, C. J.

This case relates to the inheritance tax statute of Hawaii and the application thereto of the treaty of March 2, 1899, between the United States and Great Britain.

William Woon, a native and citizen of Canada, died in Honolulu on November 20, 1927, leaving both real and personal property situate within the Territory of Hawaii. The Hawaiian Trust Company, Limited, is the duly appointed, qualified and acting executor of the will of the decedent. Woon bequeathed and devised his property to two nephews, two nieces, one grandnephew and one grandniece, all of whom are residents and citizens of the Domin-

ion of Canada, with the exception of one of the nieces who is a resident and citizen of Jamaica in British West Indies. The executor has paid to the Territory inheritance taxes in the sum of $17,893.23, an amount computed on the rate prescribed by the statute in cases in which property passes to citizens of the United States resident in the Territory of Hawaii. The executor claims that "because of the treaty of March 2, 1899, between Great Britain and the United States of America (31 Stat. L. 1939) and because of other treaties and conventions between the said countries, real estate in Hawaii and the personal property which was all physically present in the Territory of Hawaii at the date of death of said decedent * * * are to be taxed under the inheritance tax laws of the Territory of Hawaii at the same rate of taxation as if such property passed by the terms of the will to citizens of the United States resident in the Territory of Hawaii." The Territory claims on the other hand "that the real property and the personal property which comprise the residue of the estate and which under the terms of the will are to be divided equally among * * * residents and citizens of Canada and Jamaica, * * * are to be taxed * * * at the rate prescribed by territorial statute * * * where property passes to aliens of the United States."

The cause is submitted to this court under the statute upon a statement of agreed facts and it is stipulated that if the Territory prevails in its contentions as to both the real and the personal property, judgment shall be entered in its favor in the sum of $16,029.65; that should the Territory prevail only with reference to the personal property, judgment will be in its favor in the sum of $15,594.27; and that if it prevails only as to the real property, judgment in its favor will be in the sum of $362.83; and that if the executor shall prevail in its contentions,

judgment shall be entered to the effect that the executor pay no additional territorial inheritance taxes.

The statute relating to inheritance taxes (Sec. 1400, R. L. 1925) provides in brief that "when the beneficial interest to any property or income therefrom shall so pass to or for the use of" the decedent's "father, mother, husband, wife, child, grandchild, or any child adopted as such in conformity with the laws of the Territory, the rate of the tax shall be" graduated, from one and one-half per cent to three and one-half per cent on stated amounts, exempting always the first $5000, calculated upon "the market value of such property, received by each person, *except aliens and non-residents of the United States;*" that "in all other cases, *except aliens and non-residents of the United States,* the rate of tax of the market value of such property in excess of five hundred dollars ($500.00) shall be" graduated, from three per cent to six and one-half per cent; and that "when the beneficial interest to any property or income therefrom shall so pass to *an alien or non-resident of the United States,* the rate of tax shall be 10 per cent of the market value of such property received by each person, in excess of five hundred dollars ($500.00)."

The treaty referred to contains *inter alia* the following three articles: "Article I. Where, on the death of any person holding real property (or property not personal), within the territories of one of the Contracting Parties, such real property would, by the laws of the land, pass to a citizen or subject of the other, were he not disqualified by the laws of the country where such real property is situated, such citizen or subject shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged if circumstances render it necessary, and to withdraw the proceeds thereof, without restraint or interference, and exempt from any succession, probate or administrative duties or charges other than those which

may be imposed in like cases upon the citizens or subjects of the country from which such proceeds may be drawn."

"Article II. The citizens or subjects of each of the Contracting Parties shall have full power to dispose of their personal property within the territories of the other, by testament, donation, or otherwise; and their heirs, legatees, and donees, being citizens or subjects of the other Contracting Party, whether resident or non-resident, shall succeed to their said personal property, and may take possession thereof either by themselves or by others acting for them, and dispose of the same at their pleasure, paying such duties only as the citizens or subjects of the country where the property lies shall be liable to pay in like cases."

"Article V. In all that concerns the right of disposing of every kind of property, real or personal, citizens or subjects of each of the High Contracting Parties shall in the Dominions of the other enjoy the rights which are or may be accorded to the citizens or subjects of the most favored nation."

The treaty, when originally executed, did not by its provisions apply to the Territory of Hawaii, but it was therein stipulated that "the provisions of this Convention shall extend and apply to any territory or territories pertaining to or occupied and governed by the United States beyond the seas, only upon notice to that effect being given by the Representative of the United States at London, by direction of the treaty making power of the United States;" and in 1921, by mutual agreement of the High Contracting Parties, the provisions of the treaty were expressly made applicable to this Territory.

It is conceded on behalf of the Territory, and seems too clear to require argument, that any attempt to impose, as to personalty, upon British citizens resident in Hawaii a higher rate of inheritance tax than is by our statutes imposed upon American citizens resident in Hawaii would

be a discrimination forbidden by the provisions of Article II of the treaty; and it seems equally clear, as to personalty, that the imposition of a higher rate of tax upon British citizens not residing in Hawaii than on American citizens residing in Hawaii, if there were no provision for the imposition of the same higher rate of tax upon non-resident American citizens, would also be a violation of the spirit and purpose of Article II. The difficulty, if any, in this case arises from the fact that a higher rate of tax is imposed upon "aliens and non-residents of the United States" than is imposed upon American citizens resident in the Territory.

In so far as the statute seeks to impose a higher rate of tax upon aliens resident in the Territory than is imposed upon American citizens resident in the Territory the provision is unconstitutional and invalid in that it violates the requirement of Article V of the Amendments to the Constitution that "no person shall be  *  *  * deprived of life, liberty, or property, without due process of law." It has not as yet been judicially determined, either by this court or by the Supreme Court of the United States, whether the Fourteenth Amendment, in its provision that "no State shall  *  *  * deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws," is applicable to the Territory of Hawaii. However that may be, it has been expressly held that aliens are "persons" within the meaning of the equal protection clause and also within the meaning of the prohibition of the Fourteenth Amendment against deprivation of life, liberty or property without due process of law. See for example *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369; *Toyota* v. *Hawaii,* 226 U. S. 184, 191; and *Truax* v. *Raich,* 239 U. S. 33, 39. It would seem to follow necessarily that aliens are equally protected by the same pro-

vision in practically the same language found in the Fifth Amendment against deprivation of life, liberty or property without due process of law.

A part of a statute may be unconstitutional and at the same time the remainder may be upheld as constitutional. The ordinary rule on this subject is that "where the provisions are so interdependent that one may not operate without the other, or so related in substance and object that it is impossible to suppose that the legislature would have passed the one without the other, the whole must fall; but if, when the unconstitutional portion is stricken out, that which remains is complete in itself and capable of being executed in accordance with the apparent legislative intent, it must be sustained." 26 A. & E. Ency. L. 570. As further defined by the Supreme Court of the United States in *Baldwin* v. *Franks,* 120 U. S. 678, 679, "to give effect to the rule that when part of a statute is constitutional and part is unconstitutional that which is constitutional will, if possible, be enforced and that which is unconstitutional will be rejected, the two parts must be capable of separation, so that each can be read by itself; limitation by construction is not separation." To the same effect are 36 Cyc. 976-978; *United States* v. *Reese,* 92 U. S. 214, 221; *James* v. *Bowman,* 190 U. S. 127, 140, 141; and *United States* v. *Ju Toy,* 198 U. S. 253, 262. In other words, to say that a single word or expression used in a statute is unconstitutional when applied to certain facts or circumstances and constitutional when applied to other facts or circumstances would be to limit by construction and this would not be permissible; but if the parts are severable and if the part which remains can be enforced when standing by itself, and still carry out the intent of the legislature, it can be upheld as constitutional. In the present instance the statutory provision under consideration is that "when the beneficial interest

to any property or income therefrom shall pass to an alien or non-resident of the United States," the higher rate of tax shall be imposed. In our opinion the word "alien" was here used by the legislature as including both resident aliens and non-resident aliens and the word "non-resident" was used as including both citizens and aliens. That is their ordinary signification. There are in the statute no words of limitation indicating that either the word "alien" or the word "non-resident" was here used in some other than its ordinary sense. Within the above rules as to the constitutionality or unconstitutionality of parts of statutes the provision as to "aliens" may well be regarded as unconstitutional and the provision as to "non-residents" may at the same time be upheld as constitutional. The fact that the two words involve each a repetition of the meaning of the other does not militate against this construction and application of the rule.

So construing our statute, its provision, therefore, is that a tax at a lower rate shall be imposed when the recipients of the property are residents of the United States, whether citizens or aliens, and that a tax at a higher rate shall be imposed upon all non-residents of the United States whether they are citizens or aliens. The fact that there is a discrimination between residents and non-residents does not render the provision unconstitutional. The classification is reasonable and is based upon differences in fact which would justify the legislature in applying a different rate to each of the two classes. It is well settled that such discrimination in taxation is valid provided there is a reasonable ground for the different classifications. "The equal protection clause, like the due process of law clause, is not susceptible of exact delimitation. No definite rule in respect of either, which automatically will solve the question in specific instances, can be formulated. Certain general principles, however,

have been established in the light of which the cases, as they arise are to be considered. In the first place, it may be said generally that the equal protection clause means that the rights of all persons must rest upon the same rule under similar circumstances; * * * and that it applies to the exercise of all the powers of the state which can affect the individual or his property, including the power of taxation. * * * It does not, however, forbid classification; and the power of the state to classify for purposes of taxation is of wide range and flexibility, provided always, that the classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 37. To the same effect are *H. R. T. Co.* v. *Wilder,* 30 Haw. 685, 692; *Trust Co.* v. *Campbell,* 19 Haw. 262, 263; *Territory* v. *Matsubara,* 19 Haw. 641, 645; and *Giozza* v. *Tiernan,* 148 U. S. 657, 662.

Returning to the treaty, its purpose doubtless was to assure equality of treatment in the respects enumerated for the citizens and subjects of the two countries. We find no reason for supposing that the government of the United States intended to assure to non-resident citizens of Great Britain more favorable treatment than the United States or its Territory of Hawaii should accord to its own citizens situated under the same circumstances and in the same classes. We are unable to conclude that when non-resident American citizens are taxed at a certain rate it was intended by the treaty to stipulate that non-resident British citizens should be taxed at a lower rate. The expression "in like cases" found in both Article I and Article II refers to cases that are alike in all their circumstances and not simply in some of them. It refers undoubtedly, as contended by counsel for the executor, to

similarity of circumstances with reference to degrees of relationship and with reference to the amounts of principal to be taxed, but it refers also to the facts of residence and non-residence when those facts are made by the statute a reason or basis for classification and discrimination.

What has been thus far said in construing and applying the treaty applies clearly with reference to the provisions of Article II concerning the disposition of personal property. It is not so clear that under Article I real estate, in states or territories that do not make it unlawful for an alien to own and hold such property, is protected in the same way by the terms of the treaty. For reasons, however, about to be stated it will be unnecessary to determine this point in this case.

Article V provides that "in all that concerns the right of disposing of every kind of property, real or personal, citizens or subjects of each of the High Contracting Parties shall in the Dominions of the other enjoy the rights which are or may be accorded to the citizens or subjects of the most favored nation." Whatever its meaning in other respects may be, this clause certainly was intended for the protection of interests in real as well as in personal property. In Article V of the treaty between the United States and Switzerland it is provided that "the citizens of each of the contracting parties shall have power to dispose of their personal property within the jurisdiction of the other, by sale, testament, donation or in any other manner;" and that "their heirs, whether by testament or *ab intestato,* or their successors, being citizens of the other party, shall succeed to the said property or inherit it and  *  *  *  may dispose of the same as they may think proper, paying no other charges than those to which the *inhabitants* of the country wherein the said property is situated shall be liable to pay in a similar

case." In Article XXII of the treaty with Italy similar provision is made with reference to the disposition and inheritance of "personal goods," the language used being that the recipients of the property shall pay "such dues only as the *inhabitants* of the country wherein such goods are shall be subject to pay in like cases." In Article XI of the treaty with Brazil there is a similar provision with reference to "personal goods," the word "inhabitants" being again used in the same connection as in the two preceding treaties. In the treaty with Spain the provision is the same, the words used being in the one connection "personal goods" and in the other "inhabitants." In Article III of the treaty with Bavaria the provision is made expressly to refer to "real and personal property" and the word "inhabitants" is again used in the later portion of the section as in the preceding instances. The same is true of the treaty with the United States of Colombia. Its Article XII expressly refers to "personal goods or real estate" and the word "inhabitants" is again used.

While the word "inhabitants" is said to be one susceptible of various meanings (see for example 16 A. & E. Ency. L. 328 and 31 C. J. 1194), and while it has been used in different statutes and other writings in a variety of meanings, it nevertheless remains true that it imports as one of its necessary elements permanency of residence. It is derived from the Latin *"habitare,"* meaning "to dwell." As the word is commonly used its ordinary meaning is one who dwells permanently in a place. "An inhabitant of a place is one who ordinarily is personally present there, not merely *in itinere,* but as a resident and dweller therein. * * * A natural person may be a citizen or subject of one country and an inhabitant of another." *Miller.* v. *Eastern Oregon Gold Mining Co.,* 45 Fed. 345, 348. "The word 'inhabitant' implies a more fixed and permanent abode than the word 'resident;'

\* \* \* the transient visit of a person for a time at a place does not make him a resident while there; \* \* \* something more is necessary to entitle him to that character. There must be a settled, fixed abode, an intention to remain permanently at least for a time, for business or other purposes, to constitute a residence within the legal meaning of that term." *Barney* v. *Oelrichs,* 138 U. S. 529, 533, 534, quoting with approval from Chief Justice Nelson in *Frost* v. *Brisbin,* 19 Wend. 11. The inhabitants of a named country are not ordinarily understood to include persons who reside permanently in other countries. They may include those who visit other countries for temporary purposes only, but those continue to be permanent residents of their own country. There is nothing in the text of the treaties with Bavaria or with the United States of Colombia or in the treaties with Switzerland, Italy, Brazil and Spain to indicate that the word is there used as referring not only to permanent residents but also to those who are not permanent residents. To say that the word "inhabitants" as used in those treaties connotes citizenship is of no assistance, for that of itself would not solve the question of whether resident citizens only are included or whether non-resident citizens can be included.

Citing *Bartram* v. *Robertson,* 122 U. S. 116, *Whitney* v. *Robertson,* 124 U. S. 190, *Kelly* v. *Hedden,* 124 U. S. 196, and *Sullivan* v. *Kidd,* 254 U. S. 433, it is contended on behalf of the Territory that "these cases establish the proposition that the most favored nation clause of a treaty does not apply to special concessions granted by treaty to other nations in return for similar concessions granted by such other nations by treaty in return therefor," and that "all of the treaties mentioned by the taxpayer under this branch of its argument are treaties in which the United States has granted to other nations certain privileges of succession to property in return for

similar concessions granted by such other nations to the United States." This argument cannot be sustained. In *Bartram* v. *Robertson, Whitney* v. *Robertson* and *Kelly* v. *Hedden* the "other treaty" which was claimed to confer more favored treatment than did the treaty with Denmark and that with San Domingo was that entered into in 1875 between the United States and the Kingdom of Hawaii. In those cases the Supreme Court of the United States held that the same favored treatment accorded to sugars from Hawaii could not be made the standard of action as between Denmark and the United States and San Domingo and the United States, because special considerations had been in effect paid by the Kingdom of Hawaii to the United States for that more favorable treatment of its sugars. In addition to agreeing to admit certain articles which were the growth, manufacture or produce of the United States into all the ports of Hawaii free of duty, the Kingdom of Hawaii agreed that as long as the treaty remained in force it would not "lease or otherwise dispose of or create any lien upon any port, harbor, or other territory in" its "dominions, or grant any special privilege or rights of use therein, to any other power, state or government, nor make any treaty by which any other nation shall obtain the same privileges relative to the admission of any articles free of duty, hereby secured to the United States." To the United States these were valuable covenants entered into by Hawaii. They were covenants far out of the ordinary. When in the fourth case, *Sullivan* v. *Kidd,* supra, the court said, of the most favored nation clause, "that clause has been held in the practice of this country to be one not extending rights acquired by treaties containing it because of reciprocal benefits expressly conferred in conventions with other nations in exchange for rights or privileges given to this government" (254 U. S. 441), it was doubtless referring to

the cases of *Bartram* v. *Robertson, Whitney* v. *Robertson* and *Kelly* v. *Heddcn.* It cannot be understood to have declared that with reference to treaties such as those with Bavaria and with the United States of Colombia, containing a mere exchange of assurances that the citizens and subjects of each would be required to pay no higher duties in the same cases therein mentioned than were required to be paid by the citizens of the country wherein the property is situated, the mere exchange of those assurances would operate to prevent the application of the most favored nation clause in the treaty with Great Britain. Such a ruling would render nugatory practically all most favored nation clauses, for in practically all treaties other than those imposed at the close of a war by a conquering nation upon the conquered nation there are similar exchanges of assurances, the act of each operating as a consideration or inducement for the act of the other. The language of the most favored nation clauses was certainly intended by the contracting parties to have some meaning and some application. We think it applies in the case at bar and that it operates to import, as it were, into the treaty between the United States and Great Britain the more favorable covenants granted to Bavaria and the United States of Colombia with reference to both real and personal property.

The provisions, then, of the treaties with Bavaria and the United States of Colombia are such that if a citizen or subject of either of those countries were to inherit property, whether real or personal, situated in Hawaii, he could not lawfully be taxed by the Territory at a rate higher than is imposed upon a permanent resident of Hawaii. Looking solely to Article II of the treaty with Great Britain and to Article I, if that applies to real estate in all cases, the provision is merely as above held that a British citizen non-resident in Hawaii shall not be

taxed more than an American citizen non-resident in Hawaii is taxed. Under these circumstances the citizens of Bavaria and of the United States of Colombia are more favorably treated than are the British citizens and Article V of the treaty with Great Britain will therefore operate so as to require to be given to British citizens the same degree of favorable treatment that is accorded to the citizens of Bavaria and the United States of Colombia under the treaties with those countries. If the recipients of the property of the decedent involved in this case had been citizens of Bavaria or of the United States of Colombia, the Territory could not lawfully exact from them a rate higher than that which is imposed under the statute upon "inhabitants" or permanent residents of the Territory of Hawaii; that is, they could be required to pay in taxes only the same sum of money which the British recipients now before us have already paid. It therefore follows that, according the same favorable treatment to the British recipients, no additional tax can lawfully be exacted from them.

Judgment will be entered accordingly.

*H. L. Wrenn* (*Prosser, Anderson & Marx* on the briefs) for plaintiff.

*C. N. Tavares,* Deputy Attorney General (*H. R. Hewitt,* Attorney General, with him on the brief), for defendant.