FRANK NELSON, Plaintiff-Appellee, *v.* PAUL MIWA, et al., Defendants-Appellants

NO. 5560

FEBRUARY 24, 1976

RICHARDSON, C.J., KOBAYASHI, OGATA,
JJ., FUKUSHIMA, CIRCUIT JUDGE, IN
PLACE OF MENOR, J., DISQUALIFIED,
and LUM, CIRCUIT JUDGE, ASSIGNED
BY REASON OF VACANCY

OPINION OF THE COURT BY OGATA, J.

This is an appeal by the University of Hawaii, various of its officers,[1] and the State of Hawaii, hereinafter referred to as appellants, from an order enjoining them from discharging appellee from his employment at a state college solely because he attained the age of sixty-five years. This court has jurisdiction pursuant to HRS § 602-5 (Supp. 1975). We affirm.

In accordance with the employment policy imposed by the Board of Regents of the University of Hawaii (as opposed to any state statute regulating public employment)[2] appellants had refused to continue appellee as a professor of English at Hilo College, a branch of the University of Hawaii, solely because he had attained the age of sixty-five. Appellee is a college professor who specializes in teaching 18th century and medieval literature and the history of the English language. Having been first hired by appellants in the fall of 1966, appellee became tenured at Hilo College in the fall of 1969. He attained the age of sixty-five years on October 28, 1972.

The retirement policy of the Board of Regents is found in Appendix G of the Faculty Handbook for Manoa and Hilo Campuses. It reads as follows:

"Appendix G — Service beyond age 65 or retirement.

A person 65 years or older may be appointed to or continued on the faculty if it is demonstrated that his services are needed by the University and that he is more competent for the position than any other person available. Such appointment shall be for a term of one year or less, with reappointment being possible under the same test, but not beyond the age of 70.

Recommendations to the Board of Regents for post-65 appointments must include evidence of the need for and

---

[1] Paul Miwa, Chancellor of Hilo College; the individual members of the Board of Regents of the University of Hawaii; and Harlan Cleveland, President of the University of Hawaii.

[2] See, e.g., HRS § 78-3 (Supp. 1975), HRS § 88-73 (Supp. 1975), and HRS § 297-15.

superior competence of the appointee, as well as evidence that a diligent search for an individual under 65 has been made. The dean of the college, or the director of the activity concerned, shall ascertain that the faculty members of the department or other unit in which the appointee will serve have had a timely opportunity, by a secret ballot, to express approval or disapproval of the appointment.

Except under the most unusual circumstances, a faculty member aged 65 or older shall not serve as department chairman or in a comparable capacity in a research or community service division of the University."

Under the undisputed interpretation given Appendix G by appellants, whenever a faculty member who is about to attain the age of sixty-five requests a post-65 reappointment, a committee is constituted to make "a diligent search for an individual under 65." When a qualified applicant is found, the question of superior competence[3] is submitted to faculty members of the department involved who then vote on the question by secret ballot. After the chancellor or the president of the University has received the results of the secret ballot, by which he is not bound, he must then determine that the University needs the personal services of the particular post-65 professor before he will recommend post-65 reappointment to the Board of Regents. The Board does not consider the application for reappointment unless the president of the University places the question on its agenda, which he will not do unless he, or the chancellor of the branch college, has recommended the post-65 reappointment. In the past, the Board of Regents has made post-65 reappointments on at least two occasions.

That appellee is in excellent physical and mental condition is not disputed by appellants. Nor are his teaching credentials and qualifications in dispute, since his peers considered him by secret ballot of 7 to 3 to be more competent for

---

[3] "Competence" as defined in Webster's Third New International Dictionary (1967) means "the quality or state of being functionally adequate or having sufficient knowledge, judgment, skill or strength (as for a particular duty or in a particular respect)". As used in Appendix G, competence of faculty members would mean competence of the individual as a whole including his mental and physical health as well as his teaching abilities.

the teaching position than any of the forty-five other applicants for his job. Appellant Chancellor Miwa, in accordance with his responsibility under Appendix G, determined, however, that appellee's personal services were not essential to the University since a replacement for appellee was available. Accordingly, he did not recommend post-65 employment of appellee.

Appellee challenged the validity of the University's post-65 employment policy set forth in Appendix G as violative of the equal protection of the laws guaranteed by the state and federal constitutions. After finding that statutes and regulations establishing age ceilings are not prohibited *per se* by the Equal Protection Clause and that there was no discriminatorily selective enforcement of the retirement policy, the trial court concluded that although the arguments in support of its mandatory retirement policy are not entirely devoid of merit, they could not withstand the strict judicial scrutiny required because the policy affects a fundamental right to public employment.

In *State v. Johnston*, 51 Haw. 195, 456 P.2d 805 (1969), *appeal dismissed* 397 U.S. 336 (1970), we explained the effect of the equal protection clause as follows:

> "[W]hat is prohibited by the equal protection guaranty is class legislation, discriminating against some and favoring others. The guaranty was not intended to take from the states the right and power to classify the subjects of legislation, provided such classification of persons and things is reasonable for the purpose of legislation." *Id.*, 51 Haw. at 203, 456 P.2d at 810.

Therefore, the fact that the young are incidentally favored does not alone render Appendix G violative of equal protection so long as Appendix G furthers any valid state interest. But the fact that the state is acting as an employer does not authorize the state to foreclose the right to pursue public employment to a class of individuals without a rational basis therefor. *York v. State*, 53 Haw. 557, 498 P.2d 644 (1972); *Hanson v. Unified Sch. Dist. No. 500*, 364 F. Supp. 330 (D. Kan. 1973); *compare, State v. Wylie*, 516 P.2d 142 (Alaska 1973). "'[T]he theory that public employment which may be

denied altogether may be subjected to any conditions, regardless of how unreasonable has been uniformly rejected.'" *Keyishian v. Board of Regents,* 385 U.S. 589, 605-06 (1967); *Slochower v. Board of Education,* 350 U.S. 551, 555 (1956); *Wieman v. Updegraff,* 344 U.S. 183, 192 (1952).

Courts cloak most[4] statutes with a presumption of constitutionality partially out of due regard for the decision made by the body constitutionally appointed to investigate, deliberate and enact rightful subjects of legislation,[5] *Oregon v. Mitchell,* 400 U. S. 112, 207 (1970) (Harlan, J., concurring); *Kramer v. Union Free School District,* 395 U.S. 621, 628 (1969), and partially because of the limitations inherent in the judiciary, *State v. Kahalewai,* 56 Haw. 481, 485, 541 P.2d 1020, 1024 (1975); *cf. San Antonio School District v. Rodriguez,* 411 U.S. 1, 42 (1973). Accordingly a party assailing a classification as violative of the state and federal constitutions generally has the burden of showing, with convincing clarity that the classification does not rest upon some ground of difference having a fair and substantial relation to the object of the legislation.[6] *State v. Cotton,* 55 Haw. 148, 516 P.2d 715 (1973); *Hasegawa v. Maui Pineapple Co.,* 52 Haw. 327, 475 P.2d 679 (1970); *State v. Johnston, supra; State v. Diamond Motors Inc.,* 50 Haw. 33, 429 P.2d 825 (1967). We must ascertain, therefore, whether appellee has shown with

---

[4] Of course this court has recognized that laws classifying on the basis of suspect categories or impinging upon fundamental rights expressly or impliedly granted by the Constitution are presumed to be unconstitutional unless the state shows compelling state interests which justify such classifications. York v. State, 53 Haw. 557, 561, 498 P.2d 644, 647 (1972); *see also,* San Antonio School District v. Rodriguez, 411 U.S. 1, 6 (1973) (Stewart, J., concurring).

[5] The Board of Regents of the University of Hawaii is the body constitutionally appointed to formulate the policy of the University of Hawaii "in accordance with law", Hawaii Const. Art. IX, § 5 and HRS § 26-11, and to prescribe the terms of service of the faculty, HRS § 304-11. The presumption of constitutionality applies to policies set by state agencies such as the Board of Regents. *See* Pyeatte v. Board of Regents of University of Oklahoma, 102 F. Supp. 407 (D. Okla. 1951), *aff'd,* 342 U.S. 936 (1952).

[6] The lower court decided Appendix G was unconstitutional on the basis of York v. State, 53 Haw. 557, 498 P.2d 644 (1972), a case concerning a statutory three year residence requirement for public employment. In *York,* this court, applying federal constitutional law as explained in Dunn v. Blumstein, 405 U.S. 330 (1972), unanimously agreed that the rational basis test was not "easily *met by the State,*" 53

requisite clarity that there is no rational basis for the University's requirements for faculty members who are between the ages of sixty-five and seventy and who otherwise meet bona fide occupational qualifications when no similar requirements are imposed upon younger professors.

Our legislature has, in the context of employment, placed age among other categories[7] which have been declared to be inherently invidious. In 1963, the Hawaii legislature enacted Hawaii's Programs on Aging, HRS Ch. 349. HRS § 349-6(a) (Supp. 1975) states in part:

> "The legislature hereby declares that, in keeping with the traditional American concept of the inherent dignity of the individual in our democratic society, the older people of our State are entitled to, and it is the joint and several duty and responsibility of the State of Hawaii and its counties to enable our older people to secure equal opportunity to the full and free enjoyment of the following:

> \* \* \* \* \*

> (5) Opportunity for employment with no discriminatory personnel practices because of age."

The legislature of this State has made it unlawful[8] for an

---

Haw. at 558, in the case of "a fundamental interest (which) . . . cannot be impinged absent a showing . . . *on the part of the State*." 53 Haw. at 560. The decision striking the requirement as unconstitutional was based upon the finding that a rational basis had not been demonstrated. 53 Haw. at 560. The rationale set forth in *Dunn* has since been relegated to minority status by San Antonio School District v. Rodriguez, 411 U.S. 1 (1973). Accordingly, the reasoning in *York* is not presently viable as a matter of federal constitutional law. In this case we need not decide whether the Hawaii Constitution's equal protection clause, Art. I, § 4, requires that the reasoning in *York* and in Justice Marshall's dissent in *Rodriguez* apply. *See* Robinson v. Cahill, 62 N.J. 473, 490-92, 303 A.2d 273, 282 (1973); Milliken v. Green, 390 Mich. 389, 394-97, 212 N.W. 2d 711, 714-715 (1973). *Cf.* State v. Kaluna, 55 Haw. 361, 369, 520 P.2d 51, 60 (1974).

[7] *See, e.g.*, Loving v. Virginia, 388 U.S. 1, 11 (1967) (race); Oyama v. California, 332 U.S. 633, 644-46 (1948) (national origin); Graham v. Richardson, 403 U.S. 365. 372 (1971) (alienage).

[8] HRS § 378-9 states:
   "Nothing in this part shall be deemed to:

> \* \* \* \* \*

   (4) Affect the operation of the terms or conditions of any bona fide retirement, pension, employee benefit, or insurance plan;".

"employer"[9] to "discharge from employment any individual because of race, sex, *age*,[10] religion, color, ancestry, physical handicap, marital status, or arrest and court record . . . provided that an employer may refuse to hire an individual for good cause . . . ." HRS § 378-2 (Supp. 1975). *See also* HRS § 76-44[11] (Supp. 1975). The inclusion by our legislature of age among other classifications that are inherently invidious is not without significance in considering the allegations of a denial of equal protection. *Cf. Frontiero v. Richardson,* 411 U.S. 677, 687-88 (1973). Accordingly, as a co-equal branch of the State, we will not recognize classifications on the basis of age alone as a reasonable method for increasing the opportunity for public employment for some at the expense of others where there are no other state interests to be protected. *But see Townsend v. County of Los Angeles,* 49 Cal. App. 3d 263, 269, 122 Cal. Rptr. 500, 503 (Ct. App. 1975).

---

As is explained later, Appendix G is not part of the University's and the State's retirement plan.

[9] The omission of the State and its political subdivisions from the definition of "employer", HRS § 378-1, was intentional. Standing Committee Report No. 442 of the Senate Committee on Labor, 1964 Senate Journal, Budget Session, 504, wherein the committee expressed its opinion that attempts to prevent discriminatory employment practices in public employment were better made under separate legislation. *See* HRS § 76-44 (Supp. 1975).

The issue of whether the University of Hawaii is the State or its political subdivision was not raised at trial nor briefed on appeal. Therefore, it is assumed that the University is not included in the definition of employer found at HRS § 378-1.

[10] Although initially H. B. 21 (which became HRS § 378-2) only prohibited refusals to employ or continue in employment because the individual was between the ages of 40 and 65, Standing Committee Report No. 31 of the House Committee on Labor and Employment Problems, 1963 House Journal, Regular Session, 591; Standing Committee Report No. 399 of the Senate Committee on Labor, 1963 Senate Journal, Regular Session, 810, the Senate amended the bill in an "attempt to make discrimination on the basis of age more inclusive by removing specific limitations." Standing Committee Report No. 573 of the Senate Committee on Labor, 1963 Senate Journal, Regular Session, 866, 867.

[11] HRS § 76-44 (Supp. 1975) states:

"§ 76-44 *Racial, sex, age, religious, color, ancestry, or political consideration barred.* No person holding any position in the civil service shall be suspended, demoted, or dismissed from his position on racial, sex, *age*, religious, color, ancestry, or political grounds."

Nothing in HRS § 76-44 (Supp. 1975), however, is to be deemed to repeal or affect any law prescribing maximum age limits for employees of the State or any county. HRS § 76-7(5) (Supp. 1975). As noted above, Appendix G is not a statute.

Appendix G does not purport to condition post-65 reappointment upon the state of the University's budget. Consequently, we do not believe that it was adopted as a method of conserving the University's funds.[12] Arguably, however, a post-65 tenured professor will only work for a higher salary than will a younger replacement who is equally competent but not yet tenured. Thus, the argument goes, the State's interest in husbanding its funds may be furthered. Such an argument is grounded in the assumption that the University over-pays its tenured professors; that the University controls the term of employment of its tenured professors by setting some arbitrary termination date, be it based upon age or some other criteria, in order to maintain a quicker flow of less expensive professors. We reject the argument because we are unwilling to make the unlikely assumption upon which it is based[13] and because the choice of age as the criteria would be inconsistent with the State's declared policy regarding age and employment of our older residents. *See* HRS § 349-6 (Supp. 1975).

Appendix G could not be calculated to build morale among the younger faculty members. As explained at trial by the head of the committee to find a replacement for appellee, the University would need to find another "senior" person when it replaced appellee[14] in order to maintain its "reasonable spread" of junior and senior personnel. That this is the practice rather than the exception is supported by the fact that when appellants first hired appellee, he was already

---

[12] Where the stricter equal protection test applicable to classifications infringing the right to travel interstate has been applied, for example, the State's interest in saving money has been held to be insufficient to justify classification among bona fide state residents. Shapiro v. Thompson, 394 U.S. 618, 633 (1969); State v. Wylie, 516 P.2d 142, 149 (Alaska 1973).

[13] We notice that the University of Hawaii defines academic tenure as "the right to permanent or continuous service in the University which may be terminated only for adequate cause, retirement, or demonstrably *bona fide* financial exigencies." Faculty Handbook for Manoa and Hilo Campuses (University of Hawaii, 1973) Appendix A, Sec. 1(a).

[14] The testimony of the vice-chancellor was that when the University receives a cut in budget, it generally refrains from replacing retirees. In the instant case, a "senior" replacement for appellee was secured. Therefore, we are not confronted here with a situation where the subject taught, rather than the professor teaching it, has become obsolete.

fifty-nine years old; and he was not granted tenure until the age of sixty-two. Furthermore, "[t]he alleged desirability of facilitating rapid promotion by early retirement rather than a justification, [can] be seen on analysis to be age discrimination per se." *Murgia v. Massachusetts Board of Retirement,* 376 F. Supp. 753, 755 (D. Mass. 1974), *prob. juris noted,* 95 S. Ct. 1973 (1975).[15]

Appendix G is not a method of reinforcing the retirement system set up by our legislature. The faculty members at the University of Hawaii are required to become members of the Employees Retirement System of the State of Hawaii, HRS §§ 88-42, -43, -102(2) (Supp. 1975). The record in this case indicates that there are no physical characteristics attributable to college professors as a class which justify a departure from this statutory age ceiling.[16] Indeed, the statutory seventy year age limitation[17] coincides with the absolute age ceiling imposed by Appendix G. Since Appendix G is not part of the general statutory retirement system, we must look beyond whatever state interest is protected by reinforcing a retirement system with a compulsory retirement provision based on age.[18] *See, e.g., Gossman v. State Employees Retirement System,* 177 Neb. 326, 129 N.W.2d 97 (1974).

---

[15] Oral argument has been made to U.S. Supreme Court. 44 USLW 1095 (1975).

[16] *But see* HRS § 297-15 which imposes mandatory retirement at age 65 on public school teachers and educational officers. Since this statute neither provides for individual evaluation of competence nor extends post-65 employment on the basis of "need" for personal services, it is not comparable with Appendix G.

[17] In 1969 HRS § 88-63 was amended and became HRS § 88-73. Act 110, Sec. 1, S.L.H. 1969. Although the language contained in former HRS § 88-63 required retirement at age 70, the language of HRS § 88-73(a) (Supp. 1975) does not require retirement at age 70 in all cases. HRS § 78-3 (Supp. 1975), however, may require mandatory retirement at age 70 independently of the retirement system.

[18] Retirement systems may require maximum age limitations to function, *i.e.,* to effectively induce voluntary retirement. The reported reason, however, for including a maximum age limitation of eligibility of members in the Employees Retirement System of the State of Hawaii appears in *The Joint Committee on Pensions of the Senate and House of Representatives, Report on the Bill to Establish a Retirement System for Territorial Employees of the Territory of Hawaii,* 25 (1925):

"The plan provides that retirement be made compulsory at age 70. A compulsory retirement provision is usually considered desirable from the standpoint of the government because then the service will be relieved automatically of employees who are no longer able to give efficient service."

610

That the University and the State have a valid interest in maintaining the quality of education cannot be disputed. In this regard the University has the right to maintain high standards of competence and to demand that each of its faculty members has the ability to teach, to relate to students and to otherwise manage their classes. *Stebbins v. Weaver,* 396 F. Supp. 104, 111-112 (W.D. Wis. 1975); *cf. York v. State, supra.* The State urges that Appendix G was adopted in order to guarantee that professors who are older than sixty-five are fully able to carry out the singular duties of a college professor and that singling out professors older than sixty-five is reasonable because "age has an inevitable and definite relationship with the ability to perform work." *Armstrong v. Howell,* 371 F. Supp. 48, 51 (D. Neb. 1974). We note that the record shows that the actual effects of aging on capacity to perform work is largely an individual matter, a proposition which has been effectively presented in several recent law review articles. *See, e.g.,* Kaplan, *Too Old To Work: The Constitutionality of Mandatory Retirement Plans,* 44 S. CAL. L. REV. 150 (1971); Kovarsky and Kovarsky, *Economic, Medical and Legal Aspects of the Age Discrimination Laws in Employment,* 27 VAND. L. REV. 839 (1974); Fox, *Mandatory Retirement — A Vehicle for Age Discrimination,* 51 CHI-KENT L. REV. 116 (1974); Note, *Age Discrimination in Employment: The Problem of the Worker Over Sixty-five,* 5 RUTG.-CAM. L.J. 484 (1974); McHugh, *The Constitutional Challenge to Mandatory Retirement Statutes,* 49 ST. JOHN L. REV. 748 (1975); Borelho, Cain, Friedman, *Mandatory Retirement: The Law, the Courts and the Broader Social Context,* 11 WILLIAMETTE L.J. 398 (1975).

According to the undisputed interpretation given Appendix G by appellants, upon the request by an individual professor who will soon attain age sixty-five for a post-65 reappointment, his department conducts an individual evaluation

---

Since Appendix G requires individual evaluation of competency when post-65 employment is sought by those faculty members who have not attained age 70, the reported reason for the retirement system's age limitation could not be the basis for Appendix G's post-65/pre-70 requirements.

of his competence as compared to that of all other available candidates. Because of this individual evaluation, the question in this case (of a sixty-five-year-old professor seeking reappointment) of whether the state may use age as a conclusive presumption as a matter of administrative convenience in the area of mandatory retirement from public employment, *see Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974),[19] does not arise. *See also, Murgia v. Massachusetts Board of Retirement, supra*. Similarly, decisions upholding the constitutionality of a uniformly applied mandatory retirement age with no provision for individual evaluation are not controlling. *See, e.g., Weiss v. Walsh*, 324 F. Supp. 75 (S.D. N.Y. 1971), *aff'd mem.* 461 F.2d 846 (2d Cir. 1972), *cert. denied*, 409 U.S. 1129 (1973), *rehearing denied*, 410 U.S. 970 (1973); *Armstrong v. Howell, supra; McIlvaine v. Pennsylvania State Police*, 6 Pa. Cmwth., 505, 296 A.2d 630 (Com. Ct. Pa. 1972), *aff'd*, 309 A.2d 801 (1973), *appeal dismissed*, 415 U. S. 986 (1974); *Weisbrod v. Lynn*, 383 F. Supp. 933 (D.C.D.C. 1974), *aff'd summarily*, 420 U.S. 940 (1975);[20] *Rubino v. Ghezzi*, 512 F.2d 431 (2d Cir. 1975), *petition for cert. filed*, 44 USLW 3012 (1975); *Lewis v. Tucson School District No. 1*, 23 Ariz. App. 154, 531 P.2d 199 (Ct. App. 1975); *Townsend v. County of Los Angeles, supra*.

The record shows that it was solely on the basis that appellant Chancellor Miwa did not consider appellee's personal services "essential" to the University that appellee was not reappointed. The record further shows that this determination was strongly influenced by appellants' understanding that, despite the affirmative language of Appendix G that "a person over age 65 may be appointed to or continued on the faculty", under the Board's policy, professors must retire at age 65. Therefore, assuming *arguendo* that the University may validly require only post-65 members of the faculty to

---

[19] See Simson, *The Conclusive Presumption Cases: The Search for a Newer Equal Protection Continues*, 24 CATH. U. OF A.L. REV. 217 (1975).

[20] See Larkin, *The Constitutionality of Mandatory Retirement: The Significance of the Summary Affirmance in Weisbrod v. Lynn*, 9 CLEARINGHOUSE REVIEW 311 (1975).

successfully undergo individual evaluation before being reappointed, we focus on Appendix G's requirement that it must be demonstrated that a qualified post-65 faculty member's personal services are needed by the University.

While the use of a certain age as a cut-off point in employment may be justified when uniformly applied and when used without provision for individual evaluation, we are constrained to conclude that even under the rational basis test Appendix G's provision permitting the continued employment of a post-65 faculty member upon a showing of superior competence, provided that his services are needed, is not reasonably related to a state interest and is totally arbitrary. Age discrimination for its own sake has no place in public employment in our society. Appendix G is not part of the retirement scheme set up by our legislature nor is it a method of automatically terminating solely inefficient employees. Moreover, the validity of Appendix G's classification on the basis of age has become less defensible since some persons have been reappointed beyond that age. In short, we fail to see the logic in a system which provides an elaborate procedure for determining that a person is the most qualified individual for the job but, after so determining, refuses to continue to employ him solely because he has reached the age of sixty-five years.

Appendix G's requirement that a post-65 professor's personal services must be needed is not easily separable from the rest of Appendix G. Where part of a statute is unconstitutional and is inseparable from the remainder, the whole statute is invalid. *See Hawaiian Trust Co. v. Smith,* 31 Haw. 196, 202 (1929). Accordingly, we hold that Appendix G as a whole and as interpreted and implemented in this case is unconstitutional.

The judgment is affirmed.

*Charlotte E. Libman,* Deputy Attorney General *(Thomas T. Wood,* Deputy Attorney General, and *George Pai,* Attorney General, on the briefs), for defendants-appellants.

*Steven K. Christensen (Christensen* and *Clark* of counsel) for plaintiff-appellee.