## STATE OF HAWAII, Plaintiff-Appellant, *v.* FLOYD BLOSS, Defendant-Appellee

NO. 6932

JUNE 17, 1980

RICHARDSON, C.J., OGATA, MENOR, LUM, JJ.,
AND RETIRED JUSTICE KOBAYASHI,
ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY LUM, J.

This case involves the constitutionality of a State law prohibiting minors from playing or loitering near pinball machines. Defendant was arrested on November 7, 1977 and was charged with violating Section 445-43, Hawaii Revised Statutes, by allowing four minors, unaccompanied by parents, guardians or duly authorized adults, to loiter about or to play "pinball" games as defined in HRS § 445-41. Before trial, defendant filed a motion to dismiss. The district court, finding the statute unconstitutional due to vagueness of the term "to loiter about," granted the motion. The State appealed. We affirm the lower court's ruling that the statute is unconstitutional, holding that HRS § 445-43 is unconstitutional because it is vague and because it no longer bears a rational relationship to the harm sought to be avoided.

## FACTS

Defendant is the owner and manager of Fare Play Amusement, located in Waikiki. The coin-operated amusement games within defendant's establishment consist of pinball machines, "foosball" games,[1] and electronic video[2] games. Video games and pinball machines are placed alongside each other. "Foosball" and pinball games come within the definition of HRS § 445-41, but video games do not.

Defendant's establishment charges an admission fee of one dollar ($1.00) which entitles the customer to six tokens. Each token operates any game in the house. Three of the juveniles were arrested for playing pinball machines; the fourth was arrested for loitering.

---

[1] Foosball games are simulated soccer-type games in which a ball is projected against obstacles toward or away from several slots or receptacles.

[2] In video games an image is displayed on a television screen displaying a playing field and an imitation pinball in the form of a dotted light. The course of the ball on the screen is controlled by a computer program.

## ISSUES

The issues in this appeal are (1) whether the term "to loiter about" in HRS § 445-43 is unconstitutionally vague and (2) whether the entire statute violates the equal protection guaranty of the United States and Hawaii State constitutions[3] in that it no longer bears a rational relationship to the object sought to be obtained by the legislation.

## PERTINENT STATUTES

HRS § 445-43 provides that:

It shall be unlawful for any person operating or in charge of the operation of any ball or marble game, as defined in section 445-41, or any dart or similar game for which a fee is charged for playing, to permit any person under the age of eighteen years unaccompanied by either a parent or guardian, or an adult person duly authorized by a parent or guardian to accompany such child, to loiter about or to play such game, and such person shall be fined not more than $100 or imprisoned not more than thirty days, or both.

HRS § 445-41 provides that:

No person shall operate or permit to be operated on any premises under his control, for profit any machine or device used as a game or sport in which balls or marbles are projected against obstacles governing their course toward or away from various slots or receptacles, without first having obtained from the treasurer of the county an annual license therefor, for which shall be charged, and collected as a county realization, the sum of $5 for each machine or device.

---

[3] 14th amendment, U. S. Constitution and art. I, § 5, Hawaii Constitution.

## I.  VAGUENESS OF THE LOITERING PROVISION

This court has recognized that a statute is void for vagueness if it fails to provide an explicit standard of enforcement, which in practice leaves the definition of its terms to law enforcement officers and "leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *State v. Kaneakua*, 61 Haw. 136, 597 P.2d 590 (1979); *State v. Huelsman*, 60 Haw. 308, 588 P.2d 394 (1978); *State v. Kimball*, 54 Haw. 83, 503 P.2d 176 (1972); *State v. Grahovac*, 52 Haw. 527, 480 P.2d 148 (1971).

Appellant's major contention in this case is that the term "to loiter about" sets forth a clearly ascertainable standard of conduct and thus does not violate the due process clauses of the United States and Hawaii State constitutions.[4] We do not agree.

As early as *Territory v. Anduha*, 31 Haw. 459, 48 F.2d 171 (9th Cir. 1931), a statute that made it a misdemeanor for any person to "habitually loaf, loiter, and/or idle upon any public street or highway or in any public place" was held unconstitutional.

In several more recent rulings this court has held loitering and vagrancy-type statutes to be unconstitutionally vague and overbroad. In *State v. Abellano*, 50 Haw. 384, 441 P.2d 333 (1968), a statute prohibiting presence at a cockfight exhibition was held unconstitutionally vague. The court pointed out a line of cases declaring "that a penal statute must state with reasonable clarity the acts it proscribes." *Id.* at 385, 441 P.2d at 334.

Within the last ten years this reasoning from *Abellano* was reiterated in three other decisions. In *State v. Shigematsu*, 52 Haw. 604, 483 P.2d 997 (1971), we held that a statute proscribing presence at a "barricaded place" as defined by the statute in question was too vague and overbroad to satisfy the constitutional requirements of due process. In *State v. Grahovac*,

---

[4] *See* note 3 *supra*.

*supra,* we also held unconstitutionally vague and overbroad a statutory sanction against wandering about the streets at late or unusual hours of the night without any visible or lawful business. And in *In re John Doe,* 54 Haw. 647, 513 P.2d 1385 (1973), we held that Honolulu's curfew ordinance prohibiting loitering by juveniles at night was violative of due process standards. We stated: "The term 'loitering' is simply too vague and imprecise because it fails to give proper notice as to what conduct constitutes unlawful activity and, in addition, its broad sweep has the effect of inhibiting otherwise lawful conduct." *Id.* at 651, 513 P.2d at 1388.

These decisions support our conclusion that "loitering," as used in the statute before us, is unconstitutionally vague. Other courts treating similar enactments have reached the same conclusion.[5]

The State has cited cases where loitering statutes have been upheld in other jurisdictions. *State v. Armstrong,* 282 Minn. 39, 162 N.W.2d 357 (1968), concerned the constitutionality of two city ordinances which made it a misdemeanor to "loiter" or to "lurk" with the intent to solicit for purposes of prostitution or any other unlawful act. The Supreme Court of Minnesota found that the ordinances were not so vague and indefinite as to offend constitutional due process. However, the court based its opinion on the fact that the offenses defined by each of the two ordinances consisted of two essential elements: (1) the act of lurking or loitering and (2) a proved intent to commit an unlawful act. In order to obtain a conviction it was necessary to prove both elements of the offense, and the Minnesota Court found that the element of unlawful intent clarified the element of lurking or loitering, thus providing a rational basis for proscribing such acts.

Likewise, in *Wright v. Munro,* 144 Cal. App.2d 843, 301 P.2d 997 (1956), a California court upheld a statute prohibiting loitering with the purpose of soliciting alcoholic bever-

---

[5] Baker v. Bindner, 274 F.Supp. 658 (W.D. Ky. 1967); People v. Diaz, 4 N.Y.2d 469, 151 N.E.2d 871, 176 N.Y.S.2d 313 (1958); City of St. Louis v. Gloner, 210 Mo. 502, 109 S.W. 30 (1908).

ages. As in *Armstrong,* the statute in *Wright* required in addition to loitering a specific intent to do something else.

Unlike the statutes in question in *Wright* and *Armstrong,* HRS § 445-43 contains no additional requirement of unlawful intent to give meaning to the loitering provision within the statute. The person held liable under Section 445-43 is not the player, or the alleged loiterer, but is the operator of the establishment in which the playing or loitering takes place. Therefore, the "specific intent to play pinball" is not an element of the loitering provision of this statute.

Nor is the operator told by the statute the kind of behavior the police will use to distinguish the loiterer from the passerby. Juveniles may legally be on the operator's premises. Once admitted to the premises, an unaccompanied minor has the freedom to move about the public areas of the premises, except that he or she cannot watch a pinball game while standing within an uncertain distance of a pinball machine. The statute fails to define the point at which a minor's activity becomes loitering. For example, if a minor is in the company of an adult, the operator cannot be charged with a violation of HRS § 445-43. When the adult moves five feet away from the minor, is the minor now loitering or must the adult be ten or twenty feet away? And how close must an unaccompanied minor be to a pinball machine in order to be "loitering"? If the minor is watching the pinball machine from across the room, does this constitute loitering in violation of HRS § 445-43? In the context of HRS § 445-43, "to loiter about" is vague, unclear, and imprecise; it fails to define with any precision the distinction between criminal and non-criminal conduct.

The State also argues that, under *State v. Kimball, supra,* the term "loiter" must be construed in the context of the rest of the statute. However, in *Kimball* the court noted that the appellant made a claim but failed to provide any argument that the word "loiter" was vague. *Id.* at 87 n. 2, 503 P.2d at 179 n. 2. In contrast, in the case at bar, appellee has provided ample argument to support his claim that the phrase "to loiter about" is unconstitutionally vague.

In summary, we cannot say that the term "to loiter about" in HRS § 445-43 is sufficiently clear to give reasonable notice

of the prohibited conduct and to apprise the judge and the jury of the proper standards for determining guilt. We therefore hold that this term is invalid for vagueness and thereby contravenes the due process clause of the constitutions of the United States and the State of Hawaii.

## II. SEVERABILITY

Upon finding the term "to loiter about" unconstitutional, the district court invalidated the entire statute. The State contends that the lower court erred in failing to sever the term "to loiter about" from HRS § 445-43, thereby leaving the remainder of the statute to stand as constitutional.

The general rule of law concerning the concept of severability is that if any part of a statute is held invalid, and if the remainder is complete in itself and is capable of being executed in accordance with the apparent legislative intent, then the remainder must be upheld as constitutional. *Territory v. Tam,* 36 Haw. 32 (1942); *Territory v. Apa,* 28 Haw. 222 (1925).

It is not necessary, however, to deal with the issue of severability because we find that the entire statute is violative of equal protection guarantees in that it no longer bears a rational relationship to the harm sought to be avoided.

## III. EQUAL PROTECTION

The Equal Protection Clause does not prohibit the State from passing laws which treat classes of people differently, but only from treating classes differently when the basis of the discrimination does not bear a rational relationship to a legitimate statutory objective. *Jefferson v. Hackney,* 406 U.S. 535 (1972); *Reed v. Reed,* 404 U.S. 71, 75-76 (1971); *Nelson v. Miwa,* 56 Haw. 601, 604, 546 P.2d 1005, 1008 (1976); *State v. Cotton,* 55 Haw. 148, 150, 516 P.2d 715, 717 (1973); *State v. Johnston,* 51 Haw. 195, 203, 456 P.2d 805, 812 (1969). A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Reed v. Reed, supra,* quoting *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415 (1920); *Maeda v. Amemiya,* 60 Haw. 662, 594 P.2d 136 (1979).

The party assailing a classification as violative of the State and Federal constitutions generally has the burden of showing with convincing clarity that the classification is not rationally related to the object of the legislation. *Corporation Commission v. Lowe*, 281 U.S. 431 (1930); *Nelson v. Miwa, supra; Hasegawa v. Maui Pineapple Co.*, 52 Haw. 327, 475 P.2d 679 (1970); *State v. Johnston, supra.* We must ascertain, therefore, whether appellee has demonstrated with requisite clarity that HRS § 445-43 no longer bears a rational relationship to the purpose of the legislation.

We recently stated that "the fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it." *HGEA v. County of Maui*, 59 Haw. 65, 80-81, 576 P.2d 1029, 1039 (1978). In order to determine whether there is a rational basis for the classification created by HRS § 445-43, it is therefore necessary to examine the intent of the legislature as reflected in its reports to the respective houses of the legislature. *Id.* at 82, 576 P.2d at 1039-40; *In re Spencer*, 60 Haw. 497, 591 P.2d 611 (1979); *Richardson v. Belcher*, 404 U.S. 78 (1971).

HRS § 445-43 was enacted in 1945. The legislative purpose behind enactment of the statute was "to deter school children from using their lunch money to play marble or ball games or any game of skill for which a fee is charged," and to afford "additional protection to the young people of the community particularly at a time when there are so many bad influences operating upon them. . . ." *(See* House Journal, 1945, p. 562 and Senate Journal, 1945, p. 650.) Thus the test to be applied is whether HRS § 445-43 bears a fair and substantial relationship to the State's interest in (1) protecting young people from harmful influences and (2) in preventing minors from spending their lunch money on coin-operated amusement devices.

### (1) *Harmful Influences*

The legislature did not enumerate the "harmful influences" referred to in its passage of HRS § 445-43. However, HRS § 445-41, the statute which defines those games prohib-

ited by HRS § 445-43, was enacted to aid police in controlling gambling. *(See* House Journal, 1935, p. 1466.) It therefore appears that the legislature was concerned with the possibility of gambling in connection with old-style pinball machines, with the environment surrounding old-style pinball machines, and with the general atmosphere of the poolhall as harmful influences on young persons. HRS § 445-43 was therefore rationally related to a legitimate State purpose both at the time of its enactment and in 1953 when it was amended to add the loitering provision.

But pinball machines as they exist today are considerably different from those then existing and were contemplated by the passage of HRS §§ 445-41 and 445-43 in 1935 and 1945.[6] All of the various pin games, marble games, and slot machines then in use operated purely on the basis of chance. Since the enactment of HRS § 445-43 in 1945, pinball machines have become games of skill rather than games of chance. Attitudes toward pinball machines have also changed, evidenced by the fact that in recent years several jurisdictions have repealed pinball regulations.

For example, in *People v. Palazzolo,* 62 Mich. App. 140, 233 N.W.2d 216 (1975), the Court of Appeals of Michigan held that the use of "flippers" in modern pinball machines introduces a high degree of skill into the game. The court therefore concluded that modern machines do not constitute "pinball machines" within the meaning of the 1941 ordinance in question. In reaching its holding the court stated:

> Modern pinball machines involve skill to a much greater extent because of the addition of "flippers." Flippers are bars operated by a pushbutton which can be used to flip the ball upwards, back into the playing field, thus keeping the ball in play longer and enabling the player to attain a higher score. Thus the difference between the old-style and modern pinball machines is apparent. Attaining a

---

[6] The operation of these early pinball machines is described in the case of Oatman v. Port Huron Chief of Police, 310 Mich. 57, 58, 16 N.W.2d 665 (1944), and in King, *The Rise and Decline of Coin-Machine Gambling,* 55 The Journal of Criminal Law, Criminology and Police Science 199 (1964).

high score in the old-style flipperless game depended almost completely on chance. A modern pinball machine, however, armed with one or more pairs of flippers, allows for a much greater variance in scores, depending on the player's skill in manipulating the flippers.''

*Id.*, at 143-44, 233 N.W.2d at 218.

Similarly, in *Cossack v. City of Los Angeles*, 11 Cal.3d 726, 523 P.2d 260, 114 Cal. Rptr. 460 (1974), the Supreme Court of California held that the ordinance in question pertained only to games of chance and did not prohibit pinball games as they exist today. The court stated that prohibiting pinball or marble games of skill could not have been the objective of the 1939 ordinance, since such games of skill did not come into existence until almost ten years later in 1948, with the development of flippers in pinball machines.

Both the *Cossack* and *Palazzolo* courts held that the addition of flippers to pinball machines, which occurred since passage of the ordinances in question, has so enhanced the skill aspect of the game that the ordinance drafters who prohibited gambling devices in 1935 or 1941 would not have intended to prohibit modern pinball machines.[7] In light of these holdings, it is evident that HRS § 445-43 was enacted to prevent minors from establishing an affinity with pinball machines as they then existed; modern pinball machines are not the harmful influence which the legislature feared in 1945.

### (2) *Lunch Money*

The legislative history focuses on ''prevent[ing] children from spending their lunch money'' as the second purpose articulated by the legislature in support of HRS § 445-43. Laudatory as this avowed purpose may be, it does not require much imagination to conjure up other areas where a young-

---

[7] *See also* Progress Vending v. Dept. of Liquor Control, 59 Ohio App. 2d 266, 394 N.E.2d 324 (1978), which held that modern pinball machines did not involve a scheme of chance in violation of the ordinance in question, designed to prohibit gambling.

ster may foolishly, yet legally, spend his lunch money. We are therefore not prepared to view this legislative purpose as a valid basis for classifying, on the facts of this case, a pinball machine separately from other amusement games of skill. At the time when the statute in question was enacted, electronic videoscreen amusement games were not yet in existence.[8] Video games do not fall within the statutory definition of licensed game or sport devices, and therefore may be played by persons of any age. Video games are legally on the premises with pinball machines and are often interspersed with pinball machines.

There is no reasonable distinction or substantial difference between these various amusement games of skill. To prohibit the play of pinball machines but not prohibit the play of non-pinball machines may still achieve the legislative purpose of protecting minors from spending lunch money, but it also has the effect of singling out an activity which is not inherently different from those which are legally permissible.

Equal protection of the law requires that lawmakers must treat like things in a like manner. *Reed v. Reed, supra; People v. Palazzolo, supra; Nelson v. Miwa, supra; State v. Johnston, supra.* And while we recognize that the legislature may select one phase of a given problem and deal with it, neglecting other phases of the broader problem, and still not run afoul of the Equal Protection Clause, *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489 (1955), we are unable to discern a reasonable basis for classifying the modern pinball machine as an evil to be legislated against and not the other. Certainly, no suggestion has been made that the non-pinball machines herein described are also evils that may be the subject of prohibitory legislation. Whether a given classification is reasonable or unreasonable must be determined from the facts of the particular case, *State v. Freitas,* 61 Haw. 262, 602 P.2d 914 (1979), and on the facts of this case we find the challenged classification to be violative of the Equal Protection Clause.

---

[8] *See* note 7 *supra.*

Where there is no reasonable basis for the legislative classification, it will be stricken down as being arbitrary. *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 (1911). To conform with equal protection principles, the classification must be based on some ground of difference bearing a rational relation to the objectives sought to be achieved by the legislation. *Royster Guano Co. v. Virginia, supra.*

### CONCLUSION

Modern pinball machines do not belong in a statute drafted to regulate the effect of old-style pinball and slot machines, games where skill played no part and chance alone governed the players' scores. Modern pinball machines are indistinguishable from other skill-related amusement games which minors are allowed to play. Therefore, while HRS § 445-43 was justified at the time of its enactment in 1945, we must conclude that under the rational-basis test the statute no longer bears a reasonable or substantial relationship to the harm sought to be avoided. Accordingly, we find that HRS § 445-43 as a whole and as interpreted and implemented in this case violates the equal protection of the laws guaranteed by the State and Federal constitutions and is unconstitutional.

*Arthur E. Ross (Ann M. Misura* on the briefs), Deputy Prosecuting Attorneys, for plaintiff-appellant.

*Evan R. Shirley (Marguerite B. Simson* with him on the brief, *Shirley & Jordan* of counsel), for defendant-appellee.