## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CA-00422-SCT

*MISSISSIPPI GAMING COMMISSION AND MIKE MOORE, ATTORNEY GENERAL OF THE STATE OF MISSISSIPPI*

*v.*

*SUSAN HENSON d/b/a GENE'S AMUSEMENT, LANCE FOSTER d/b/a MOJO AMUSEMENT, JAMES (FRANK) WADE d/b/a FRANK'S AMUSEMENT, GARY SIMPSON d/b/a ALL FUN AND GAMES, NEAL ROBERTS d/b/a GENERAL AMUSEMENT, ROBERT KNIGHT d/b/a BOB'S AMUSEMENT, JERRY TURNER d/b/a TRAILBLAZER'S TRUCK STOP & RESTAURANT, KATHERINE McALPHINE d/b/a L.C.J.'s, GERALD NOLAN d/b/a NOLAN'S GROCERY, AND GREG DRISKILL d/b/a TRI-COUNTY GAME ROOM*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/27/1999 |
| TRIAL JUDGE: | HON. CHARLES D. THOMAS |
| COURT FROM WHICH APPEALED: | UNION COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  R. STEWART SMITH, JR. |
| ATTORNEYS FOR APPELLEES: | DANIEL K. TUCKER |
| | JOSEPH C. LANGSTON |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED - 09/06/2001 |
| MOTION FOR REHEARING FILED: | 9/19/2001; denied 11/29/2001 |
| MANDATE ISSUED: | 12/6/2001 |

## CONSOLIDATED WITH

## NO. 1999-IA-00911-SCT

*MISSISSIPPI GAMING COMMISSION*

*v.*

*STANLEY WRIGHT AND SD AMUSEMENTS OF MISSISSIPPI, INC.*

DATE OF JUDGMENT:                    05/24/1999

TRIAL JUDGE:                         HON. W. ASHLEY HINES

COURT FROM WHICH APPEALED:           WASHINGTON COUNTY CIRCUIT COURT

ATTORNEY FOR APPELLANT:              JOAN MYERS

ATTORNEY FOR APPELLEES:              JOHN H. COX, III

NATURE OF THE CASE:                  CIVIL - OTHER

DISPOSITION:                         REVERSED AND RENDERED - 09/06/2001

MOTION FOR REHEARING FILED:

MANDATE ISSUED:

**EN BANC.**

**BANKS, PRESIDING JUSTICE, FOR THE COURT:**

¶1. These consolidated appeals concern the propriety of the Mississippi Gaming Commission's seizure of certain amusement devices. Because we conclude that the machines in question, the "Cherry Master Video" and the "Quarter Pusher," are slot machines and as such, illegal gambling devices subject to seizure by the Gaming Commission, we reverse the judgments of the courts below and render judgment for the Commission.

**I.**

¶2. On March 20, 1998, Susan Henson, d/b/a Gene's Amusement, Lance Foster d/b/a Mojo Amusement, James (Frank) Wade d/b/a Frank's Amusement, Gary Simpson d/b/a All Fun and Games, Neal Roberts d/b/a General Amusement, Robert Knight d/b/a Bob's Amusement, Jerry Turner d/b/a Trailblazer's Truck Stop & Restaurant, Katherine McAlphine d/b/a L.C.J's Gerald Nolan d/b/a Nolan's Grocery, and Greg Driskel d/b/a Tri-County Game Room, (hereinafter "Henson") filed a Bill of Peace on behalf of themselves and all those similarly situated, seeking clarification and interpretation of current Mississippi gaming laws as to the criteria for determining the legality of certain amusement devices owned and/or leased by the appellees and seized by the Mississippi Gaming Commission, on the grounds that they were illegal gambling devices.

¶3. Following a trial, the Chancery Court of Union County entered a judgment finding that the statute in question, Miss. Code Ann. § 75-76-5(ff) (2000), requires proof of a payoff before the Mississippi Gaming Commission can seize a machine under Miss. Code Ann. § 97-33-7(1) (2000). Aggrieved, the Gaming Commission appealed the chancellor's decision to this Court.

¶4. On February 3, 1999, Stanley Wright, owner of eight amusement companies located in Washington County, filed a complaint and affidavit for replevin in the Circuit Court of Washington County after the Gaming Commission seized machines from his establishments on January 21, 1999.

¶5. In acknowledgment of the Union County Chancery's Court's ruling, the Washington County Circuit Court entered an order requiring the Gaming Commission to return to Wright all machines seized, with the

exception of two that were said to have involved payoffs. The court held in abatement, however, a final ruling on the matter until such time as this Court ruled on the appeal from Union County Chancery Court and made a final determination as to whether the machines in question constituted illegal gambling devices.

¶6. Aggrieved by the circuit court's order, the Mississippi Gaming Commission filed and was granted interlocutory review of the matter, and the Wright case was subsequently consolidated with the Henson case.

**II.**

¶7. The central legal issue presented in these cases is whether Miss. Code Ann. § 75-76-5(ff) (2000) requires proof of a payoff before a machine is subject to seizure under Miss. Code Ann. § 97-33-7(1) (2000). We conclude that where the elements of consideration and chance are present, Miss. Code Ann. § 75-76-5(ff) requires only that machines possess the "potential for reward" to be considered a slot machine subject to seizure and destruction under Miss. Code Ann. § 97-33-7(1).

¶8. Section 97-33-7(1) of the Mississippi Code provides in pertinent part as follows:

(1) It shall be unlawful for any person or persons, firm, copartnership, or corporation to have in possession, own, control, display, or operate any cane rack, knife rack, artful dodger, punch board, roll down, merchandise wheel, *slot machine*, pinball machine, or similar device or devices. Provided, however, that this section shall not be so construed as to make unlawful the ownership, possession, control, display or operation of any antique coin machine as defined in Section 27-27-12, or any music machine or bona fide automatic vending machine where the purchaser receives exactly the same quantity of merchandise on each operation of said machine. Any slot machine other than an antique coin machine as defined in Section 27-27-12 which delivers, or is so constructed as that by operation thereof it will deliver to the operator thereof anything of value in varying quantities, in addition to the merchandise received, and any slot machine other than an antique coin machine as defined in Section 27-27-12 that is constructed in such manner as that slugs, tokens, coins or similar devices are, or may be, used and delivered to the operator thereof in addition to merchandise of any sort contained in such machine, is hereby declared to be a gambling device, and shall be deemed unlawful under the provisions of this section. Provided, however, that pinball machines which do not return to the operator or player thereof anything but free additional games or plays shall not be deemed to be gambling devices, and neither this section nor any other law shall be construed to prohibit same.

(2) No property right shall exist in any person, natural or artificial, or be vested in such person, in any or all of the devices described herein that are not exempted from the provisions of this section; *and all such devices are hereby declared to be at all times subject to confiscation and destruction,* and their possession shall be unlawful, except when in the possession of officers carrying out the provisions of this section. It shall be the duty of all law- enforcing officers to seize and immediately destroy all such machines and devices.

. . . .

Miss. Code Ann. § 97-33-7(1) (2000) (emphasis added).

¶9. Our Court has previously held that the mere possession of an illegal gambling device, such as a slot machine, is enough for a violation of the above statute. *Stevens v. State*, 225 Miss. 48, 82 So.2d 645

(1955); ***Clark v. Holden***, 191 Miss. 7, 2 So.2d 570 (1941).[1] The operative term, however, is not defined in the statute, and so we turn to Section 75-76-5(ff) of Mississippi's Gaming Control Act, which offers the following definition:

> "Slot machine" means any mechanical, electrical or other device, contrivance or machine which, upon insertion of a coin, token or similar object, or upon payment of any consideration, is available to play or operate, the play or operation of which, whether by reason of the skill of the operator or application of the element of chance, or both, may deliver or entitle the person playing or operating the machine to receive cash, premiums, merchandise, tokens or anything of value, whether the payoff is made automatically from the machine or in any other manner. The term does not include any antique coin machine as defined in Section 27-27-12.

Miss. Code Ann. § 75-76-5(ff) (2000).

¶10. Three essential elements can be extrapolated from the above language: consideration, value, and the potential for reward. Thus, a device is clearly a slot machine of the type prohibited under Section 97-33-7 if:

> 1. Its play or operation requires the insertion of money, tokens or similar objects, or payment of *consideration*; and

> 2. As a result of playing or operating the device, the player or operator has the potential to win a reward in the form of cash, premiums, merchandise, token, or *anything of value*; and

> 3. The winning of some part or all of the *potential reward* is dependent in substantial part on an element of chance.

¶11. The Court recognizes that the definition of slot machines provided in Section 76-75-5 (ff) of the Gaming Control Act is broader than that applied by this Court in pre-Gaming-Control Act cases. In ***Rouse v. Sisson***, 190 Miss. 276, 282, 199 So. 777, 778 (1941), for example, in order for a device to be subject to the provisions of [Chapter 353, Laws of 1938, the predecessor to] Section 97-33-7, an uncontrolled and uncontrollable chance must have existed. As a result, those devices in which the outcome was determined solely by skill were not prohibited. Under the Gaming Control Act, however, "whether by reason of the skill of the operator or application of the element of chance, or both," amusement devices satisfying the elements of consideration and payoff are deemed illegal gaming devices and seized accordingly. Miss. Code Ann. § 75-76-5(ff) (2000).

¶12. The amusement devices seized by the Mississippi Gaming Commission here include the "Cherry Master Video" and "Quarter Pusher" games. The "Cherry Master Video" is an electronic machine that displays a series of nine symbols (e.g., cherries, bananas, other fruits, etc.) in a three-by-three matrix format of rows and columns. The symbols form three lines horizontally, three vertically, and two diagonally, for a total of eight lines. The machine requires the insertion of money to play which is then converted into credits, generally at a conversion rate of one credit for every five cents inserted.

¶13. To initiate play, the player pushes a button on the machine to place a bet. The player can bet multiple credits on each play of the machine, thereby increasing the number of lines that are subject to winning combinations and increasing the potential winnings. The length of time to complete each play is only a few seconds, and increasing a bet does not extend the time of play. The player has the potential of winning

hundreds of credits for a single winning combination.

¶14. Once play is initiated, the device produces a video simulation of reels spinning, after which the reels come to rest. If a winning combination occurs, the machine records on a meter the number of credits won and offers an option of either adding these credits to the credit balance or using them to bet "double or nothing" on a card game which is a secondary feature on the machine. The credits won can be accumulated on the machine, with each credit having an equivalent value of five cents. Once accumulated, the credits can be used in the same manner as the credits obtained from inserting money. The outcome of the machine's operation is randomly determined. To erase the accumulated credits, the machines have a knock-off mechanism and an accounting system that tracks winnings and credits erased from the machine, along with other data.

¶15. The "Quarter Pusher" is a machine in which the player deposits a quarter into a machine containing other quarters, on the chance that his quarter will dislodge other quarters and start a chain-reaction resulting in one or more quarters being dispensed to the player.

¶16. To initiate play, a player drops a quarter into a movable slot on the machine, allowing the player to vary the spot where the coin falls. The machine has upper and lower shelves which contain coins. The falling coin strikes other coins on an upper shelf, causing them to move. The machine also contains moving arms, or paddles, which push the coins, causing them to fall from the upper shelf to the lower shelf, in a "waterfall" effect. Two bumper areas on the lower shelf of the machine return coins to the "house" through side holes. Quarters which are not returned to the "house," but which get pushed off the lower shelf, are dispensed to the player. Once a quarter is dropped, the player has no control over the movement of the quarters or how they fall.

¶17. The "Quarter Pusher" machine is clearly a violation of the statute. This machine requires consideration (a quarter), has an element of chance (the possibility of quarters falling), and the potential for a reward (at least one quarter). It has already been deemed an illegal gambling device in other jurisdictions. *United States v. Two (2) Quarter Fall Machines*, 767 F. Supp. 153, 156 (E.D. Tenn. 1991); *State v. Maillard*, 695 N.E.2d 637, 640-41 (Ind. Ct. App. 1998)("Quarter Pusher" machine is an illegal gambling device). In *United States v. Two (2) Quarter Fall Machines*, the court, in a succinct analysis of the operation of machines similar to the "Quarter Pusher," stated:

> There is virtually no skill involved in operating these quarter fall machine. The movable slot gives the appearance that one can control the fall of the quarters in meaningful manner. This, however, is illusory. The player cannot control the sweepers, and really has no control over when and how quarters fall into the payoff chute. The payoff depends exclusively on how the coins are piled up at the time the player inserts quarters. It is clear that these machines are intended to deliver quarters a result of an element of chance. Therefore, they are gambling devices under 15 U.S.C. § 1171(a)(2).

767 F. Supp. at 156.

¶18. Whether the mere receipt of electronic credits from the "Cherry Master" machine is a payoff of something of value pursuant to our statute, however, is less certain. The potential receipt of money from the Quarter Pusher machine is distinguishable from the intangible value of credits awarded by the Cherry Master machines. Notwithstanding this difference, the statute expressly provides that a payoff may be made "automatically from the machine or in any other manner." Miss. Code Ann. § 75-76-5(ff). It does not limit

the payoffs, as the appellees allude, to tokens and coins. In fact, there is no practical difference between a credit awarded to a player and a token dispensed from a machine. The award of tokens is a payoff regardless of whether the tokens are redeemable for cash, merchandise, or for additional plays of the machine. The award of credits by the Cherry Master to play free additional games is likewise something of value, as a credit to play a free game necessarily has the same value as the amount it would cost to play that game.

¶19. Other jurisdictions considering the issue have also held that credits for free games constitute something of value. In *United States v. Sixteen Electronic Gambling Devices*, 603 F. Supp. 32, 33 (D. Haw. 1984), for example, the court explained: "'Credit,' when used in conjunction with electronic with electronic video display gambling devices that simulate casino-type games such as 'poker,' 'black jack,' or 'keno' is something of value." In *United States v. One Hundred Thirty-Seven (137) Draw Poker-Type Machines and Six (6) Slot Machines*, 606 F. Supp. 747, 752 (N.D. Ohio 1984), *aff'd mem.*, 765 F.2d 147 (6th Cir. 1985), the court stated: "Each credit represents a play of the machine and, therefore, holds the value of a quarter to the player." *See Rankin v. Mills Novelty Co.*, 32 S.W.2d 161, 162 (Ark. 1930) ("Anything that contributes to the amusement of the public is a thing of value."); *Broaddus v. State*, 150 S.W.2d 247, 250 (Tex. Crim. App. 1941)("Free games offered by the machine were things of value."). *See also Score Family Fun Ctr., Inc. v. San Diego County*, 275 Cal. Rptr. 358, 359 (Dist. Ct. App. 1990); *State v. Doe*, 46 N.W.2d 541 (Iowa 1951); *Steely v. Commonwealth*, 164 S.W.2d 977 (Ky. 1942); *Vaughan v. Dowling*, 144 So.2d 371 (La. 1962); *Oatman v. Davidson*, 16 N.W.2d 665 (Mich. 1944); *State v. One Coin-operated Video Game Machine*, 467 S.E.2d 443, 446 (S.C. 1996).

¶20. Another jurisdiction has gone even further, holding that the mere concept of "added amusement" is a thing of value. *State v. Brown*, 688 N.E.2d 295, 297 (Ohio Ct. App. 1996). In discussing the illegality of the "Cherry Master" machine, the Ohio Court of Appeals noted that "amusement has value and added amusement has additional value, and where added amusement is subject to be procured by chance without the payment of additional consideration thereof, there is involved in the game the elements of gambling namely, price, chance, and a prize." *Id.* at 297 (quoting *Kraus v. City of Cleveland*, 19 N.E.2d 159, 161 (Ohio 1939)). Interpreting language similar to that contained in the Mississippi statute, the court went on to hold that "where the evidence demonstrates that by placing money into a video slot machine a player can acquire or win, purely by chance, additional playing time on that machine without paying additional money, thereby gaining added amusement, the state has proved the existence of a "game of chance" as that term is defined in Ohio's gambling statutes." *Id*. Because the "Cherry Master Video" game requires consideration, has an element of chance, and returns a thing of value, the court deemed the game an illegal gambling device. *Id*. We find the same to be true here.

¶21. Henson argues that this Court in *Stubbs v. State,* 206 Miss. 485, 40 So.2d 256, 258 (1949), required proof that the defendants were in fact engaged in gaming at the time in question, Henson's reliance on *Stubbs v. State* is misplaced. In *Stubbs*, the Court held that thirteen defendants who stood around a dice game were not gambling. *Id* at 258. Specifically, we stated that there must be some proof that they were gambling. *Id*. That case is clearly distinguishable, however, as the issue here is not whether anyone played the game, but whether the game itself is illegal.[2]

### III.

¶22. For these reasons, we conclude that the machines in question, the "Cherry Master Video" and the

"Quarter Pusher", constitute illegal gambling devices (slot machines) pursuant to Miss. Code Ann. § 75-76-5(ff) (2000) and therefore, were properly seized or subject to seizure under Miss. Code Ann. § 97-33-7(1) (2000).[(3)] We reverse the judgment of the Union County Chancery Court enjoining the seizure of the machines, and we render judgment here finally dismissing Henson's Bill of Peace and action with prejudice. Likewise, we reverse the judgment of the Washington County Circuit Court, and we render judgment here finally dismissing Wright's complaint, affidavit and replevin action with prejudice.

¶23. **REVERSED AND RENDERED.**

**PITTMAN, C.J, SMITH, WALLER AND COBB, JJ., CONCUR. DIAZ, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J., AND EASLEY, J. MILLS, J., NOT PARTICIPATING.**

**DIAZ, JUSTICE, DISSENTING:**

¶24. With respect for my colleagues in the majority, I dissent believing the statutes in question to be unconstitutionally vague, requiring the seizure and destruction of practically every arcade and amusement device. In addition, the majority's holding with respect to the "Cherry Master Video" games completely disregards the clear language of Miss. Code Ann. § 97-33-7(1) (2000). Therefore, I would affirm the judgment of the Union County Chancery Court as well as that of the Washington County Circuit Court.

¶25. The majority extrapolated a three-part test from Miss. Code Ann. § 75-76-5(ff) (2000) in order to determine what constitutes a prohibited slot machine under Miss. Code Ann. § 97-33-7. I do not disagree with the majority's interpretation; I find the statute itself to be the problem. The concern arises because the statute requires only (1) the payment of consideration, (2) the potential to win "anything of value", and (3) the "potential reward is dependent in substantial part on an element of chance." Specifically, the majority stated, "[b]ecause the 'Cherry Master Video' game requires consideration, has an element of chance, and returns a thing of value, the Court deemed the game an illegal gambling device. We find the same to be true here." Under this test, nearly every amusement device imaginable qualifies as an illegal gambling machine.

¶26. As the majority highlights, the statute makes no allowance for games involving skill; they too fall within Miss. Code Ann. § 97-33-7(1). "Quarter Pusher"-type games have been prevalent at local carnivals and county fairs for decades and only now are being seized. There are more examples of innocent games that would qualify as illegal gambling devices. At nearly every corner grocery store, there is a crane game where children drop in quarter after quarter trying to win a stuffed animal of some sort. According to the statute, the Gaming Commission should be seizing and destroying these machines as well. In fact, every arcade and children's pizzeria where games are played for tickets that can be exchanged for merchandise is, according to the statute and the majority, operating an illegal casino.

¶27. Miss. Code Ann. § 97-33-7(1), in conjunction with Miss. Code Ann. § 75-76-5(ff), gives no clear indication of which machines are illegal and subject to seizure, and which are not. Such a law is the very definition of vagueness: "a law which does not fairly inform a person of what is commanded or prohibited is unconstitutional as violative of due process." *Black's Law Dictionary* 1549 (6th ed. 1997) (citing **McCrary v. State**, 429 So. 2d 1121, 1123 (Ala. Crim. App. 1982). Thus, I agree with the lower courts' rulings.

¶28. Even if § 97-33-7(1) was not already unconstitutionally vague, the majority ignored the statute's clear language in its application to the "Cherry Master Video" games. The statute clearly states that machines

"which do not return to the operator or player thereof anything but free additional games or plays **shall not** be deemed to be gambling devices." Miss. Code Ann. § 97-33-7(1) (emphasis added). The majority's entire argument rests upon the free credits awarded by "Cherry Master Video" games and, partially, upon the idea that added amusement classify as something of value. According to the majority, "[t]he award of credits by the Cherry Master to play free additional games is likewise something of value, as a credit to play a free game necessarily has the same value as the amount it would cost to play that game." However, this statement is in direct conflict with the unambiguously clear language of the statute. In holding as it does, the majority essentially deletes the last sentence of § 97-33-7(1).

¶29. Miss. Code Ann. § 97-33-7(1) along with the definition in Miss. Code Ann. § 75-76-5(ff) gives absolutely no guidance as to what constitutes an illegal gambling device. It is this lack of definiteness that makes the statute unconstitutionally vague. Furthermore, the majority's argument flies in the face of the very statute which it purports to enforce. Thus, for these reasons, I would affirm the judgments of the lower courts.

### McRAE, P.J., AND EASLEY, J., JOIN THIS OPINION.

1. In both *Clark* and *Stevens*, there was a statute that made "possession" of an illegal gambling device a violation. *Clark*, 2 So.2d at 572; *Stevens*, 82 So.2d at 647. That statute has been repealed. However, our current statute also makes it illegal to possess a slot machine. *See* Miss. Code Ann. § 97-33-7 (1). Our statute defining a slot machine requires the potential receipt, or payoff, of anything of value.

2. The dissent accuses the Commission of ignoring the last sentence of Miss. Code Ann. § 97-33-7(1) (2000). Instead it is the dissent which attempts to rewrite that sentence by deleting the word "pinball." The statute provides that "*pinball machines* which do not return to the operator or player thereof anything but free additional games or plays shall not be deemed to be gambling devices .. ." *Id.* (emphasis added). This legislative exemption from the coverage of the statute is expressly limited to pinball machines, a device which incorporates some degree of skill. It has been recognized by other courts that modern pinball machines are predominated by skill, not chance, and are therefore "indistinguishable from other skill-related amusement games which minors are allowed to play." *State v. Bloss,* 613 9 P.2d 345, 361 (Haw. 1980); *People v. Mason,* 68 Cal. Rptr. 17 (1968); *Games Management v. Owens,* 622 P.2d 260, 262 (Kan. 1983).

3. The dissent suggests that our interpretation would allow devices such as the "crane game where children drop in quarter after quarter trying to win a stuffed animal of some sort" which, the majority suggests, are found in every "corner grocery store." We discern no record support for such an observation of fact. As we look around, corner grocery stores are few and far between, with or without devices of chance geared toward children. If, however, there is indeed a prevalace of and need for such machines devices which fall under the legislative definition of gambling devices, it for the Legislature to provide some exemption or for the corner grocery store to find another method of amusing children for profit.