# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00851-COA

**RONALD MOORE**                                                         **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/29/2018 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHUCK McRAE |
| | DREW McLEMORE MARTIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LOUIS P. FRASCOGNA |
| DISTRICT ATTORNEY: | JOHN D. WEDDLE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED: 06/23/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND C. WILSON, JJ.**

**C. WILSON, J., FOR THE COURT:**

¶1. Ronald Moore appeals his conviction of one count of racketeering and two counts of operating an illegal sweepstakes café. On appeal, Moore raises two issues: (1) the Attorney General lacked jurisdiction to prosecute him, and (2) his conviction must be reversed due to the cumulative effect of errors during trial. We find no error and affirm.

## BACKGROUND AND PROCEDURAL HISTORY

¶2. This case stems from Moore's operation of the Junction Café in Shannon, Mississippi. Moore sold food and prepaid phone minutes in the café. Moore also had several computer

terminals in the café. On the terminals, customers could play simulated games that resembled gambling programs, such as slot machines, keno, and poker. Customers needed a "sweepstakes" code to play the games, but customers could not purchase a sweepstakes code outright. Instead, customers received sweepstakes codes by purchasing something else in the store, such as food or phone minutes.

¶3. When a customer made a purchase, the customer received a purchase receipt with a sweepstakes code on it. The customer then had two options. The customer could ask the store clerk to reveal whether he or she had won a cash prize, or the customer could use the code to play one of the simulated gambling games. Those games implemented the pre-determined outcome of the code. If the customer "won," the customer could then choose to redeem the cash prize at the counter, or the customer could use his or her winnings to receive additional sweepstakes codes and continue playing.

¶4. Following multiple undercover surveillance operations, the Mississippi Gaming Commission raided the Junction Café. On February 2, 2015, a Lee County grand jury indicted Moore on five counts: Count I (racketeering); Count II (enticing/inducing to gamble); Count III (gaming without a license); and Counts IV and V (operating an illegal sweepstakes café).

¶5. The Attorney General, with the apparent blessing of the Lee County District Attorney, prosecuted Moore on behalf of the State. In a February 17, 2016 letter addressed to the Mississippi Gaming Commission, and copying Special Assistant Attorney General Louis Frascogna, Lee County District Attorney John Weddle explained that the Lee County District

2

Attorney's office had "reviewed the matters involved in the investigation of Ronald Moore . . . by the Mississippi Gaming Commission[,]" and it "declined to prosecute due to the special nature of the crimes alleged." Weddle also stated that "[t]hough this was conveyed verbally to your counsel, this letter shall serve as documentation of that agreement."

¶6. Prior to trial, the State voluntarily dismissed Counts II and III with prejudice. The remaining charges against Moore were initially tried in February 2016; however, the jury was unable to agree on a verdict, resulting in a mistrial. Moore's case was tried a second time in November 2017. The jury in the second trial found Moore guilty of Counts I, IV, and V.

¶7. The court sentenced Moore in March 2018. For Count I, the court sentenced Moore to twenty years in the custody of the Mississippi Department of Corrections (MDOC), suspended all twenty years, and placed Moore on five years of probation. The court also ordered Moore to pay $1,796.50 in court costs, a $150,000 fine, and $8,339.64 in restitution to the Attorney General's office for investigative fees. For Counts IV and V, the court sentenced Moore to one year per count in the MDOC's custody, suspended each year, and ordered Moore to pay a $1,000 fine per count. The court further ordered that Moore's sentences were to run consecutively.

¶8. Moore filed post-trial motions for judgment notwithstanding the verdict and for a new trial. The circuit court never ruled on Moore's post-trial motions, so the motions were deemed denied. Moore now appeals. On appeal, Moore raises two issues: (1) whether the Attorney General had jurisdiction to prosecute him, and (2) whether he received a fair and impartial trial. Finding no error, we affirm.

STANDARD OF REVIEW

¶9. "Jurisdiction is a question of law, which receives a de novo review on appeal." *In re Underhill*, 262 So. 3d 1111, 1113 (¶6) (Miss. 2019). We review the giving or refusing of jury instructions for abuse of discretion. *Nelson v. State*, 284 So. 3d 711, 716 (¶18) (Miss. 2019).

## DISCUSSION

### I. *The Attorney General had authority to prosecute Moore.*

¶10. Moore first contends the Attorney General lacked legal authority to prosecute this case, so the circuit court did not have jurisdiction over this matter. Moore relies heavily on *Williams v. State*, 184 So. 3d 908 (Miss. 2014), for this contention. We find *Williams* is distinguishable from the case at hand and disagree with Moore.

¶11. In *Williams*, the supreme court reversed and remanded the appellant's murder conviction. *Id*. at 909 (¶1). On remand, the local district attorney sought a nolle prosequi, which the circuit court initially granted. *Id*. However, the circuit court later vacated the nolle prosequi and appointed the Attorney General's office as a special prosecutor in the case. *Id*. The local district attorney objected to the intervention of the Attorney General. *Id*. at 910 (¶6). On interlocutory appeal, the supreme court found "[t]he involuntary disqualification of the local district attorney and the substitution of the Office of the Attorney General, *over the objection of the local district attorney*" to be "wholly unsupported by any constitutional, common law, or statutory authority of the State of Mississippi." *Id*. at 909 (¶1) (emphasis added). The supreme court clarified that the "[i]ntervention of the [A]ttorney [G]eneral into

4

the independent discretion of a local district attorney regarding whether or not to prosecute a criminal case constitutes an impermissible diminution of the statutory power of the district attorney." *Id*. at 913 (¶15).

¶12.    The *Williams* court distinguished *Bell v. State*, 678 So. 2d 994 (Miss. 1996): "in [*Bell*], unlike in [*Williams*], no evidence was adduced that the local district attorney *opposed* the involvement of the [A]ttorney [G]eneral. . . ." *Williams*, 184 So. 3d at 913 (¶14). In *Bell*, the supreme court addressed the authority of the Attorney General to "'institute' a criminal prosecution":

> [T]he Attorney General is a [c]onstitutional officer possessed of all the power and authority inherited from the common law as well as that specially conferred upon him by statute. This includes the right to institute, conduct and maintain all suits necessary for the enforcement of the laws of the state, preservation of order[,] and the protection of public rights.

*Bell*, 678 So. 2d at 996 (internal quotation marks omitted) (quoting *Gandy v. Reserve Life Ins. Co.*, 279 So. 2d 648, 649 (Miss. 1973)); *accord Williams*, 184 So. 3d at 922 (¶46) (Coleman, J., dissenting) (outlining the common-law duties of the Attorney General).

¶13.    *Bell* also aligns with Mississippi Code Annotated section 7-5-1 (Rev. 2014), which states that the Attorney General is the

> chief legal officer and advisor for the state, both civil and criminal, and is charged with managing all litigation on behalf of the state . . . . [She] shall have the powers of the Attorney General at common law and, except as otherwise provided by law, is given the sole power to bring or defend a lawsuit on behalf of a state agency, the subject matter of which is of statewide interest.

¶14.    We find that this matter is distinguishable from *Williams* and consistent with *Bell* because here, as in *Bell*, the local district attorney did not affirmatively oppose the

5

involvement of the Attorney General. Indeed, the Lee County District Attorney indicated his "agreement" that the Attorney General should prosecute this action on behalf of the Mississippi Gaming Commission, a state agency, to enforce the laws of this State by stopping Moore's operation of an illegal "Internet sweepstakes café," a crime prohibited by Mississippi Code Annotated section 97-33-8(2) (Rev. 2014).

¶15. Although district attorneys are generally responsible for prosecuting local criminal offenses, the Attorney General is the "chief legal officer and advisor for the [S]tate," Miss. Code Ann. § 7-5-1, vested with "the right to institute, conduct and maintain all suits necessary for the enforcement of the laws of the state . . . ." *Bell*, 678 So. 2d at 996 (quoting *Gandy*, 279 So. 2d at 649). As stated in *Williams*, this does not mean that the Attorney General is the district attorney's "boss." *Williams*, 184 So. 3d at 913 (¶16). To the contrary, the Attorney General cannot "involuntarily disqualif[y] . . . a duly elected district attorney from the lawful performance of his duty. . . ." *Id*. at 913-14 (¶17). But that is not what happened here. The record indicates that the Attorney General prosecuted Moore with at least the implicit blessing of the Lee County District Attorney, who declined to prosecute Moore based upon "the specialized nature of the crimes alleged." Accordingly, the Attorney General had both the authority, vested in common law and statute, as well as the district attorney's consent, to prosecute Moore in this matter. This issue lacks merit.

II.     *The trial errors alleged by Moore do not require reversal.*

¶16. Moore's second contention on appeal is that his conviction must be reversed due to the cumulative effect of trial errors. Although Moore lists a number of alleged trial errors

6

in his appeal brief, he only provides citations and support for two alleged errors: "[T]he [c]ourt [kept] Mr. Moore from introducing testimony and evidence that he acted without criminal intent," and "[t]he jury instructions, read as a whole, did not fairly announce the law of the case, resulting in injustice to Mr. Moore." As a result, these are the only issues that we will address. *See Williams v. State*, 269 So. 3d 294, 297 (¶9) (Miss. Ct. App. 2018) ("It is well established that we are 'not required to address any issue that is not supported by reasons and authority,' and we decline to do so here.") (quoting *Varvaris v. Perreault*, 813 So. 2d 750, 753 (¶6) (Miss. Ct. App. 2001)).

> A.  The court allowed Moore's testimony about a lack of criminal intent as to the racketeering charge, rendering any error in excluding other testimony harmless.

¶17. Moore first contends that he should be granted a new trial because the circuit court excluded testimony and evidence that he acted without criminal intent.[1] According to Moore, both Bobby Moak (an attorney and former legislator) and Chuck McRae (an attorney and former Mississippi Supreme Court Justice) "proffered testimony which tended to negate [his] criminal intent." Although Moak and McRae were not allowed to testify before the jury, Moore testified regarding the legal advice that he received from McRae. Any error from the court's exclusion of the other witnesses' testimony that Moore acted without criminal intent was therefore harmless.

---

[1] Moore principally addresses this issue in his reply brief. As a general rule, "[t]his Court does 'not consider issues raised for the first time in an appellant's reply brief.'" *Jenkins v. State*, 283 So. 3d 217, 221 (¶14) (Miss. Ct. App. 2019) (quoting *Moore v. State*, 250 So. 3d 521, 526 (¶16) (Miss. Ct. App. 2018)), *cert. denied*, Order, No. 2018-CT-00453-SCT (Miss. Sept. 5, 2019). However, because Moore raises and provides minimal support for this contention in his initial appeal brief, we address the merits.

*B. The jury instructions fairly announced the law of the case.*

¶18. Next, Moore contends that the instructions provided to the jury did not fairly announce the law of the case. The supreme court recently summarized our standard of review for allegedly defective jury instructions as follows:

> Jury instructions are generally within the discretion of the trial court and the settled standard of review is abuse of discretion. Jury instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. When read together, if the jury instructions fairly state the law of the case and create no injustice, then no reversible error will be found. We have held that a defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Nelson*, 284 So. 3d at 716 (¶18) (citations and internal quotation marks omitted).

*i. Instruction S-9*

¶19. Challenging specific jury instructions, Moore first asserts that "the [c]ourt improperly permitted instruction S-9, which stated conditions for guilt to be prioritized over instructions which stated conditions for acquittal." However, upon review of the record, the court refused to give proposed instruction S-9. Accordingly, this alleged error is groundless.

*ii. Instruction S-10*

¶20. Moore next asserts that "the [c]ourt improperly permitted instruction S-10 [(trial instruction 14)], which relied for authority on an Attorney General opinion [and] improperly elevated the opinion as equivalent to binding precedent or law." Instruction S-10 provided, "The [c]ourt hereby instructs the Jury that poker and keno are gambling games regardless of the ability to place a wager and win an award, and as such, may only be offered on the

8

premises of a licensed gaming establishment." Taking this instruction into consideration with the others given, we find that as a whole, the jury instructions fairly stated the applicable law.[2]

¶21.    Moore was charged with one count of racketeering and two counts of operating an illegal sweepstakes café under Mississippi Code Annotated section 97-33-8. Pursuant to section 97-33-8(2),

> It shall be unlawful for any person or entity to possess, own, control, display, operate[,] or have a financial interest in an electronic video monitor that:
>
>> (a) Is offered or made available to a person to play or participate in a simulated gambling program in return for direct or indirect consideration, including consideration associated with a product, service[,] or activity other than the simulated gambling program; and
>>
>> (b) The person who plays or participates in the simulated gambling program may become eligible to win, redeem[,] or otherwise obtain a cash or cash-equivalent prize, whether or not the eligibility for or value of the prize is determined by or has any relationship to the outcome or play of the program.

The circuit court gave a jury instruction that directly tracked this language.

¶22.    As part of his defense at trial, Moore contended that he fell under the "safe harbor" provision of section 97-33-8(5), which states that

> [t]he provisions of this section shall not apply to:
>
> . . .
>
>> (b) Any lawful marketing promotion, contest, prize[,] or sweepstakes that is designed to attract consumer attention to a specific product or service which is offered for sale by the manufacturer, distributor,

---

[2] We reach this conclusion based upon the relevant statutes, not the referenced Attorney General opinion.

vendor[,] or retailer of the product or service . . . .

In response, the State contended that the simulated gambling programs that Moore operated at the Junction Café did not meet this exception from section 97-33-8's proscribed activities because poker and keno, two of the simulated gambling programs that were available at the Junction Café, are expressly illegal under Mississippi's gaming laws unless conducted by a gaming licensee. Accordingly, the State requested instruction S-10, which the circuit court gave as trial instruction 14. We find no reversible error in the court's doing so.

¶23. Under the statutory scheme applicable to Moore's case, instruction S-10 was necessary because, as the State contended, poker and keno are explicitly illegal under Mississippi's gaming laws (unless operated by a gaming licensee). For this reason, those games could not be part of "[a]ny lawful marketing promotion, contest, prize[,] or sweepstakes" under the "safe harbor" in section 97-33-8(5)(b).

¶24. Mississippi Code Annotated section 75-76-5(k) (Rev. 2009) defines "'game' or 'gambling game'" to include:

> any banking or percentage game played with cards, with dice[,] or with any mechanical, electromechanical[,] or electronic device or machine for money, property, checks, credit[,] or any representative of value, including, without limiting, the generality of the foregoing, . . . *keno*, . . . *poker*, . . . slot machine, or any other game or device approved by the commission. However, "game" or "gambling game" shall not include bingo games or raffles which are held pursuant to the provisions of Section 97-33-51, or the illegal gambling activities described in Section 97-33-8.

(Emphasis added);[3] *see Miss. Gaming Comm'n v. Six Elec. Video Gambling Devices*, 792 So.

---

[3] The exclusion of "the illegal gambling activities described in Section 97-33-8" from section 75-76-5(k)'s definition of "game" or "gambling game" is of no moment to our analysis. We read section 75-76-5's exclusion of "the illegal gambling activities described

2d 321, 325-26 (¶14) (Miss. Ct. App. 2001) (assuming arguendo that "the Gaming Control

Act definition of ['games'] is applicable to the criminal statute" and stating that "[o]nly if

that definition overrides established interpretations of the criminal statute would we need to

make a holding regarding its applicability"); *see also Moore v. Miss. Gaming Comm'n*, 64

So. 3d 537, 539-40 (¶9) (Miss. Ct. App. 2011) (applying definition of "slot machine" in

section 75-76-5(ff) (Rev. 2002) in affirming that machines seized from internet café were

illegal gambling devices) (citing *Miss. Gaming Comm'n v. Henson*, 800 So. 2d 110, 113

(¶10) (Miss. 2001)). In turn, section 75-76-55(1) provides that

> it is unlawful for any person, either as owner, lessee[,] or employee, whether
> for hire or not, either solely or in conjunction with others, without having first
> procured and thereafter maintaining in effect a state gaming license:
>
> > (a) To deal, operate, carry on, conduct, maintain[,] or expose for play
> > in the State of Mississippi any gambling game, including, without
> > limitation, any gaming device, slot machine, race book or sports
> > pool . . . .

*See also* Miss. Code Ann. § 97-33-13 (Rev. 2014).[4] Based upon these statutes, we conclude

that instruction S-10, considered with the other instructions given at trial, fairly stated the law

---

in Section 97-33-8" from its definition of "game" or "gambling games" simply to clarify that
section 97-33-8 contains its own defined terms in providing that "the operation of 'Internet
sweepstakes cafes' is an illegal gambling activity under state law." Miss. Code Ann. § 97-
33-8(1), (3).

  [4] Section 97-33-13 provides:

> Any owner, lessee, or occupant of any outhouse or other building, who shall
> knowingly permit or suffer any of the before mentioned . . . games, or any
> other game prohibited by law, to be carried on, kept, or exhibited in his said
> . . . building, or on his lot or premises, being thereof convicted, shall be fined
> not less than [$100] nor more than [$2,000].

applicable to this case and thus created no injustice.

### iii. Instruction D-7

¶25. Third, Moore contends "the [c]ourt erred in denying instruction D-7, which provided an 'advice of counsel instruction,' which was important for Mr. Moore's defense to the RICO [(Mississippi Racketeer Influenced and Corrupt Organization Act)] charge and to counter the allegation of criminal intent." We disagree.

¶26. To begin, we note that Mississippi does not have precedent on advice of counsel as a defense to a criminal act. But the court allowed Moore to testify about the legal advice he received from former Supreme Court Justice McRae, who indicated that Moore's gaming systems complied with Mississippi law.[5] Moore relied on this testimony to counter the State's allegation of Moore's criminal intent, contending that his reliance on McRae's advice showed that Moore lacked the criminal intent necessary for a racketeering violation.

¶27. Further, the court instructed the jury that, to find Moore guilty of racketeering, it had to find that Moore

    1. *With criminal intent*

    2. Receive[d] proceeds derived directly or indirectly, from

    3. Engaging in at least two (2) or more incidents of operating an illegal internet sweepstakes café

    4. To use or invest, whether directly or indirectly, part of such proceeds or the proceeds derived from the investment or use thereof

---

[5] Apparently, the legal advice that McRae provided Moore regarded a different establishment in West Point, Mississippi, not the Junction Café. (It is Moore's position that the gaming systems used at the two establishments are identical.)

12

> 5.     In the establishment or operation of an enterprise[.]

(Emphasis added).  In other words, the court allowed Moore to testify about his reliance on advice of counsel and argue that the legal advice negated criminal intent, and the court then placed the issue of criminal intent before the jury for its decision.  We therefore find this issue to be without merit.

### iv.     Requested Statute

¶28.   Lastly, Moore asserts that "the court compounded the errors when it refused to provide the jury with a copy of a statute it requested during instructions, instead referring the jury back to other instructions."  Upon review of the record, the jury actually asked for "a copy of all law (MS) referenced in the trial."  The court discussed the jury's request with counsel for both parties:

> THE COURT:
>
> . . . We have talked about this.  The attorneys and I have talked about this. There is some agreement about providing Chapter 33 with some deletions to them.  But while that discussion was going on, I received a request for all, which I don't intend to do.  I - - if everyone is in agreement, I will pass this to the jury, but I'm not particularly fond of it.
>
> I think the better practice would be for me to tell them I cannot provide those statutes and that they can refer to [c]ourt's [i]nstructions . . . . And I think that's all of the - - anybody think of anything else that needs to be included?

¶29.   During this discussion, Moore's counsel did not object to the court not providing the jury with the requested law but asked to submit an amended jury instruction regarding section 97-33-8. The court denied this request, and Moore's counsel made no objection to the denial. The alleged error is therefore procedurally barred.  *Walker v. State*, 671 So. 2d 581, 596

13

(Miss. 1995).

## CONCLUSION

¶30.    The Attorney General had both the authority, grounded in common law and statute, and the district attorney's consent, to prosecute Moore in this matter.  Therefore, Moore's contention that the circuit court lacked jurisdiction over this matter is without merit.  Likewise, we find no merit in Moore's assertion that his conviction must be reversed due to the cumulative effect of errors during trial.  Accordingly, we affirm Moore's conviction.

¶31.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE AND McCARTY, JJ., CONCUR.  McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**